[No. S116288. Mar. 10, 2005.]

CRONUS INVESTMENTS, INC., Plaintiff, Cross-defendant and Appellant; HOWARD JON COLMAN, Cross-defendant and Appellant, v. CONCIERGE SERVICES, Defendant, Cross-complainant and Respondents; WESTREC MARINA MANAGEMENT, INC., et al., Defendants and Respondents.

COUNSEL

William A. Soroky; Rehwald Rameson Lewis & Glasner, William Rehwald, Lawrence M. Glasner and Daniel R. Chaleff for Plaintiff, Cross-defendant and Appellant and for Cross-defendant and Appellant.

Greines, Martin, Stein & Richland, Robert A. Olson and Cynthia E. Tobisman for Health Net of California as Amicus Curiae on behalf of Plaintiff, Cross-defendant and Appellant and Cross-defendant and Appellant.

Thomas J. Ready for Defendant, Cross-complainant and Respondent and for Defendants and Respondents.

OPINION

CHIN, J.— ■ Code of Civil Procedure section 1281.2, subdivision (c)[1] permits a trial court, under specified circumstances, to stay arbitration pending the outcome of related litigation. In *Volt Info. Sciences v. Leland Stanford Jr. U.* (1989) 489 U.S. 468 [103 L.Ed.2d 488, 109 S.Ct. 1248] (*Volt*), the United States Supreme Court held that the Federal Arbitration Act (FAA), 9 United States Code section 1 et seq., which applies to and favors the enforcement of arbitration agreements affecting interstate commerce, does not preempt the application of section 1281.2, subdivision (c) where the parties have agreed that their arbitration agreement would be governed by the law of California. In this case, the parties agreed that their arbitration agreement would be governed by California law, but they further agreed that the designation of California law "shall not be deemed an election to preclude application of the [FAA], if it would be applicable." As explained below, we conclude that, in this situation, the FAA also does not preempt the application of section 1281.2, subdivision (c).

### FACTS AND PROCEDURAL HISTORY

In July 2000, Howard Colman transferred a home-management business, Dew-All Services, Inc. (Dew-All), to a newly created company, Concierge Services, LLC (Concierge). Cronus Investments, Inc. (Cronus), which is wholly owned by Colman, has a 20 percent interest in Concierge, while Westrec Marina Management, Inc. (Westrec) owns the remaining interest. The transactions involved six agreements: (1) a limited liability company (LLC) agreement between Cronus and Westrec, which created Concierge; (2) a stock purchase agreement by which Concierge bought the stock in Colman's

---

[1] Except as otherwise noted, all further statutory references are to the Code of Civil Procedure.

preexisting company, Dew-All; (3) an employment agreement by which Concierge employed Colman as its president; (4) a covenant not to compete and confidentiality agreement between Colman and Concierge; (5) a consulting agreement between Cronus and Concierge; and (6) a guaranty agreement executed by Westrec of a promissory note payable by Concierge to Colman.

Four of the six agreements provide for the arbitration of any disputes between the parties "arising out of, in connection with, or in relation to the interpretation, performance or breach of this Agreement . . . ."[2] The arbitration clause further specifies that "The designation of a situs or specifically a governing law for this agreement or the arbitration shall not be deemed an election to preclude application of the [FAA], if it would be applicable."[3] The agreements also contained a choice-of-law clause providing that "[t]his agreement shall be construed and enforced in accordance with and governed by the laws of the State of California, without giving effect to the conflict of laws provisions thereof."

Problems arose after the execution of the agreements, resulting in Colman's discharge from his employment with Concierge. On March 19, 2002, Cronus sued Concierge, Westrec, Westrec Contracting, LLC (an affiliate of Westrec), Michael M. Sachs (chief executive officer of Westrec), and William W. Anderson and Michael P. Robbins (principals in Westrec). The complaint asserted claims for breach of contract, breach of fiduciary duty, conversion and fraud. After Cronus filed its complaint, Colman and Cronus submitted a demand for arbitration to the American Arbitration Association (AAA) under the arbitration clauses in the underlying agreements.

Concierge then filed a cross-complaint against Colman, Cronus, Nelson Colman (Colman's father), and Desert Home Services, Inc. (Desert), which is operated by Nelson Colman. The cross-complaint asserted claims for breach of contract, fiduciary fraud, unjust enrichment, and inducement of breach of

---

[2] The LLC and guaranty agreements did not contain arbitration provisions.

[3] The arbitration clause read in full as follows:

"9.10. Arbitration

"(a) Agreement to Arbitrate. Any controversy, dispute or claim arising out of, in connection with, or in relation to the interpretation, performance or breach of this Agreement, including any claim based on contract, tort or statute, shall be settled, at the request of either party, by arbitration conducted in Los Angeles, California in accordance with the then existing Rules for Commercial Arbitration of the American Arbitration Association ('AAA'), and judgment upon any award rendered by the arbitrator may be entered by any State or Federal court having jurisdiction thereof. Any controversy concerning whether a dispute is an arbitrable dispute shall be determined by the arbitrator. The parties intend that this agreement to arbitrate be valid, specifically enforceable and irrevocable. The designation of a situs or specifically a governing law for this agreement or the arbitration shall not be deemed an election to preclude application of the [FAA], if it would be applicable."

contract. It alleged that Colman and Cronus improperly diverted business from Concierge to Colman's father and Desert.

Colman and Cronus then petitioned the superior court, under sections 1281.2 and 1281.4, to stay the litigation and compel arbitration, contending that they had already demanded arbitration and that some of the cross-claims implicated agreements containing an arbitration clause.

Defendants, in turn, moved to stay the arbitration pending the outcome of litigation and to consolidate the arbitration proceeding with the underlying action under section 1281.2, subdivision (c) (section 1281.2 (c)). The trial court determined that (1) some of the causes of action and controversies in the underlying action were not subject to arbitration; (2) only three of the eight cross-claims were arbitrable; (3) some of the litigants were not parties to agreements containing an arbitration agreement; and (4) the lawsuit and arbitration proceedings contained overlapping issues of fact and law. To avoid the possibility of contradictory outcomes and promote efficiency in the resolution of disputes, the court denied the petition to stay litigation and compel arbitration, granted the motion to stay the arbitration proceedings pending outcome of the litigation, and consolidated the three arbitrable cross-claims with the action "for all purposes."

The Court of Appeal affirmed the trial court's ruling. First, as a matter of contract interpretation, the Court of Appeal found that the "not . . . preclude" language of the arbitration clause superseded the broader and more general choice-of-law provision and concluded that the parties intended that the FAA apply to the "fullest extent" and "without limitation" in those contracts containing arbitration agreements. Second, the Court of Appeal analogized a trial court's authority to stay arbitration proceedings (§ 1281.2(c)) to a court's authority to stay lawsuits when resolving problems of multiple litigation (§ 526, subd. (a)(6)) and found that section 1281.2(c) is a neutral law derived from equitable principles applicable to all contracts. The court thus determined that, because section 1281.2(c) on its face is "an evenhanded application of state principles addressing the general problem of multiple litigation," the FAA does not preempt its application.

In their petition for review, plaintiff Cronus and cross-defendant Colman (hereafter appellants) claim that the Court of Appeal erred in concluding that the FAA does not preempt the application of section 1281.2(c). Defendants (hereafter respondents) filed an answer to the petition, requesting that we determine whether the parties intended to incorporate section 1281.2(c) into the arbitration agreements and whether the FAA's procedural rules apply in California courts. Without limiting the issues, we granted review to determine, in this case, whether the FAA preempts the application of section 1281.2(c).

DISCUSSION

Section 1281.2(c) requires a court to order arbitration upon petition by one of the parties to an arbitration agreement, "unless [the court] determines that: [¶] . . . [¶] (c) A party to the arbitration agreement is also a party to a pending court action . . . with a third party, arising out of the same transaction or series of related transactions and there is a possibility of conflicting rulings on a common issue of law or fact." If the court makes such a determination, it "(1) may refuse to enforce the arbitration agreement and may order intervention or joinder of all parties in a single action . . . ; (2) may order intervention or joinder as to all or only certain issues; (3) may order arbitration among the parties who have agreed to arbitration and stay the pending court action . . . pending the outcome of the arbitration proceeding; or (4) may stay arbitration pending the outcome of the court action . . . ."

The parties do not dispute that this case comes within the exception to the general rule of arbitration enforcement specified in section 1281.2(c). Three of the 10 parties to the court action (Concierge, Colman, and Cronus) are parties to arbitrable agreements and the arbitration proceeding. But the other seven parties to the court action (Westrec, Westrec Contracting, Sachs, Anderson, Robbins, Nelson Colman, and Desert) are not parties to any arbitration agreement and thus are not amenable to arbitration. None of the parties appear to dispute that many of the claims in the lawsuit are nonarbitrable. On the other hand, the parties do dispute whether they intended that section 1281.2(c) procedures would govern the enforcement of those contracts that contain the arbitration provisions.

Under United States Supreme Court jurisprudence, we examine the language of the contract to determine whether the parties intended to apply the FAA to the exclusion of California procedural law and, if any ambiguity exists, to determine whether section 1281.2(c) conflicts with or frustrates the objectives of the FAA. We first examine the underlying purpose of and the rights created by the FAA and the applicable preemption principles.

A. *The FAA's Purpose*

In 1925, Congress passed the FAA to "overrule the judiciary's longstanding refusal to enforce agreements to arbitrate" and to place such agreements " 'upon the same footing as other contracts, where it belongs.' [Citation.]" (*Dean Witter Reynolds Inc. v. Byrd* (1985) 470 U.S. 213, 219–220 [84 L.Ed.2d 158, 105 S.Ct. 1238]) (*Byrd*)). The federal statute rests on the authority of Congress to enact substantive rules under the commerce clause, requiring courts to enforce arbitration agreements in contracts involving interstate commerce. (*Southland Corp. v. Keating* (1984) 465 U.S. 1, 10–11

[79 L.Ed.2d 1, 104 S.Ct. 852] (*Keating*).) Here, the parties agree that the contracts at issue involve interstate commerce and, thus, fall within the coverage of the FAA.

Section 2, the primary substantive provision of the FAA, provides: "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2.)

"Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." (*Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.* (1983) 460 U.S. 1, 24 [74 L.Ed.2d 765, 103 S.Ct. 927] (*Moses H. Cone*).) Thus, the FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." (*Moses H. Cone, supra,* 460 U.S. at pp. 24–25.) The policy of enforceability established by section 2 of the FAA is binding on state courts as well as federal courts. (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 405 [58 Cal.Rptr.2d 875, 926 P.2d 1061] (*Rosenthal*).)

■ However, the FAA's purpose is not to provide special status for arbitration agreements, but only "to make arbitration agreements as enforceable as other contracts, but not more so." (*Prima Paint Corp. v. Flood & Conklin Mfg. Co.* (1967) 388 U.S. 395, 404, fn. 12 [18 L.Ed.2d 1270, 87 S.Ct. 1801].) In accord with this purpose, the high court has stated that state contract rules generally govern the construction of arbitration agreements. (See, e.g., *Doctor's Associates, Inc. v. Casarotto* (1996) 517 U.S. 681, 685 [134 L.Ed.2d 902, 116 S.Ct. 1652] (*Doctor's Associates*) [" '[s]tate law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally' "]; *First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, 944 [131 L.Ed.2d 985, 115 S.Ct. 1920] [state law principles governing formation of contracts generally apply in deciding arbitrability issue]; *Allied-Bruce Terminix Cos. v. Dobson* (1995) 513 U.S. 265, 281 [130 L.Ed.2d 753, 115 S.Ct. 834] ["States may regulate contracts, including arbitration clauses, under general contract law principles . . . ."].) "[T]he federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate." (*Volt, supra,* 489 U.S. at p. 476.) Thus,

the FAA does not force parties to arbitrate when they have not agreed to do so (see *Byrd, supra,* 470 U.S. at pp. 219–220) or require them to do so under any specific set of procedural rules (*Volt, supra,* 489 U.S. at pp. 476, 479). "Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate [citation], so too may they specify by contract the rules under which that arbitration will be conducted." (*Volt, supra,* 489 U.S. at p. 479.)

### B. *Preemption*

■ "The FAA contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration. [Citation.] ■ But even when Congress has not completely displaced state regulation in an area, state law may nonetheless be pre-empted to the extent that it actually conflicts with federal law—that is, to the extent that it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' [Citation.]" (*Volt, supra,* 489 U.S. at p. 477.)

■ To ensure that arbitration agreements are enforced according to their terms, the FAA preempts all state laws that apply *of their own force* to limit those agreements against the parties' will or to withdraw the power to enforce them. (See, e.g., *Perry v. Thomas* (1987) 482 U.S. 483, 490–491 [96 L.Ed.2d 426, 107 S.Ct. 2520] [FAA preempted California statute that rendered private agreements to arbitrate wage collection claims unenforceable by requiring judicial forum for resolution of those claims]; *Keating, supra,* 465 U.S. at p. 16 & fn. 10 [FAA preempted California statute that rendered agreements to arbitrate certain franchise claims unenforceable by requiring judicial forum for resolution of those claims].) Although state law may be applied to regulate contracts, including arbitration clauses, " '*if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally[,]' [citation]" courts may not invalidate arbitration agreements under state law contract principles applicable *only* to arbitration provisions, and that therefore disfavor such contracts, or single them out for "suspect status." (*Doctor's Associates, supra,* 517 U.S. at pp. 686–687.) For example, the high court found that a Montana statute that made arbitration clauses unenforceable unless the contract provided notice of the arbitration clause " 'in underlined capital letters on the first page of the contract' " directly conflicted with the FAA; the state law conditioned the enforceability of arbitration agreements on a notice requirement not applicable to contracts generally. (*Doctor's Associates, supra,* 517 U.S. at pp. 684, 687–688.) Only "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2" of the FAA. (*Doctor's Associates, supra,* 517 U.S. at p. 687.)

■ In addition, the FAA establishes a prophylactic rule governing ambiguities in arbitration clauses. Section 2 of the FAA (9 U.S.C. § 2), applicable to any arbitration agreement within the coverage of the Act, requires that "questions of arbitrability . . . be addressed with a healthy regard for the federal policy favoring arbitration." (*Moses H. Cone, supra,* 460 U.S. at p. 24.) Any doubts or ambiguities as to the scope of the arbitration clause itself should be resolved in favor of arbitration. (*Id.* at pp. 24–25; see also *Volt, supra,* 489 U.S. at pp. 475–476.)

## C. *Volt*

*Volt* involved the application of section 1281.2(c) to a lawsuit with interrelated arbitrable and nonarbitrable claims and parties who were not subject to the arbitration agreement at issue. The underlying contract, which covered the installation of an electrical system on the Stanford University campus, contained an agreement to arbitrate all disputes between the parties " 'arising out of or relating to this contract or the breach thereof.' " The contract also contained a choice-of-law provision that the contract " 'shall be governed by the law of the place where the Project is located,' " which was California. After disputes arose, Volt demanded arbitration. Stanford, in turn, filed an action in the California superior court against Volt and other companies involved in the construction project with whom it did not have arbitration agreements. The trial court, ruling on Stanford's motion to stay the arbitration and Volt's motion to compel arbitration and stay the lawsuit, stayed the arbitration under section 1281.2(c). (*Volt, supra,* 489 U.S. at pp. 470–471.)

The California Court of Appeal affirmed the trial court's ruling, concluding that the choice-of-law provision incorporated California's rules of arbitration into the contract. (*Volt, supra,* 489 U.S. at pp. 471–472.) After acknowledging that "the interpretation of private contracts is ordinarily a question of state law, which this Court does not sit to review," the high court accepted the Court of Appeal's construction that the choice-of-law provision incorporated the state arbitration laws, including section 1281.2(c). (*Volt, supra,* 489 U.S. at pp. 474–476.) The court held that application of the California statute to stay arbitration would not undermine the goals and policies of, and is not preempted by, the FAA in a case where the parties have agreed that their arbitration agreement will be governed by the law of California. (*Volt, supra,* 489 U.S. at pp. 470, 477–479.) "There is no federal policy favoring arbitration under a certain set of procedural rules; the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate." (*Id.* at p. 476.)

### D. *The Choice-of-law and Arbitration Clauses in This Case*

In this case, the choice-of-law clause provides: "This agreement shall be construed and enforced in accordance with and governed by the laws of the State of California, without giving effect to the conflict of laws provisions thereof." The parties seem to agree that the broad choice-of-law provision generally incorporates California law, including the California Arbitration Act (CAA) (§ 1280 et seq.), of which section 1281.2(c) is a part.

*Mount Diablo Medical Center v. Health Net of California, Inc.* (2002) 101 Cal.App.4th 711 [124 Cal.Rptr.2d 607] *(Mount Diablo)*—in which the choice-of-law provision was similar to the one here—supports their interpretation. There, the court stated: "The choice-of-law provision in the present case may be 'generic' in the sense that it does not mention arbitration or any other specific issue that might become a subject of controversy, but it is nonetheless broad, unqualified and all-encompassing. It provides that 'the validity, construction, interpretation and enforcement of this Agreement' shall be governed by California law. The explicit reference to enforcement reasonably includes such matters as whether proceedings to enforce the agreement shall occur in court or before an arbitrator. Chapter 2 (in which § 1281.2 appears) of title 9 of part III of the California Code of Civil Procedure is captioned 'Enforcement of Arbitration Agreements.' An interpretation of the choice-of-law provision to exclude reference to this chapter would be strained at best." *(Mount Diablo, supra,* 101 Cal.App.4th at p. 722.)

Thus, we agree that the choice-of-law provision—which is substantially similar to the provisions in *Mount Diablo* and *Volt*—incorporates California's rules of arbitration into the contract. However, the contracts at issue in *Mount Diablo* and *Volt* did not contain the arbitration clause here, which states: "The designation of a situs or specifically a governing law for this agreement or the arbitration shall not be deemed an election to preclude application of the [FAA], if it would be applicable." The parties agree that, as specified in the arbitration clause, the scope of the choice of law provision is "specifically limited by applicable provisions of the FAA" and is nullified "only where the FAA's provisions are inconsistent with the CAA." Respondents contend that the procedural rules of section 1281.2(c) do not conflict with the FAA's procedural provisions—because they do not apply in state court—or with its substantive provision (9 U.S.C. § 2). Appellants respond that we need not determine whether section 1281.2(c) conflicts with the procedural provisions of the FAA because application of section 1281.2(c) would, nevertheless, contravene the substantive goals and policies of the FAA. Because we disagree with appellant's premise, we first decide whether the procedural provisions of the FAA conflict with section 1281.2(c).

■ Section 3 of the FAA concerns the enforcement of arbitration agreements in a pending lawsuit. It requires the "courts of the United States" to grant a party's request for a stay of litigation on an arbitrable issue, pending completion of the arbitration. (9 U.S.C § 3.)[4] ■ Section 4 of the FAA concerns petitions for enforcement of an arbitration agreement where one party refuses to arbitrate. It requires a "United States district court" to entertain an application to compel arbitration. (9 U.S.C § 4.)[5]

The language used in sections 3 and 4 and the legislative history of the FAA suggest that the sections were intended to apply only in federal court proceedings. Section 4 refers to the "United States district court" and provides that it can be invoked only in a court that has jurisdiction under title 28 of the United States Code. (9 U.S.C. § 4.) This language indicates that Congress intended to limit the application of the section to federal courts. "In 1954, as a purely clerical change, Congress inserted 'United States district court' in § 4 as a substitute for 'court of the United States.' [Act of Sept. 3, 1954, ch. 1263, § 19, 68 Stat. 1226, 1233.] Both House and Senate Reports

---

[4] Section 3 of the FAA states: "If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration."

[5] Section 4 of the FAA states: "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. Five days' notice in writing of such application shall be served upon the party in default. Service thereof shall be made in the manner provided by the Federal Rules of Civil Procedure. The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof."

explained: ' "United States district court" was substituted for "court of the United States" because, among Federal courts, such a proceeding would be brought only in a district court.' H.R.Rep. No. 1981, 83d Cong., 2d Sess., 8 (1954); S.Rep. No. 2498, 83d Cong., 2d Sess., 9 (1954)." (*Keating, supra,* 465 U.S. at p. 29, fn. 18 (dis. opn. of O'Connor, J.).)

Although 9 United States Code section 3 is less clear, it would appear that "courts of the United States" under section 3 means federal district courts, because state courts are courts "in" but not "of" the United States as commonly designated in federal law. (*Keating, supra,* 465 U.S. at p. 29, fn. 18 (dis. opn. of O'Connor, J.).) Because sections 3 and 4 constitute part of the same enforcement scheme under the FAA, the language in both sections should be interpreted consistently. (*Keating, supra,* 465 U.S. at p. 29, fn. 17 (dis. opn. of O'Connor, J.) ["§ 3 applies when the party resisting arbitration initiates the federal-court action; § 4 applies to actions initiated by the party seeking to enforce an arbitration provision"].) Moreover, before the minor amendment in section 4's phrasing, "[a]s originally enacted, § 3 referred, in the same terms as § 4, to 'courts [or court] of the United States.' " (*Keating, supra,* 465 U.S. at p. 29 (dis. opn. of O'Connor, J.).) The legislative history of the original enactment further suggests that sections 3 and 4 were intended to regulate federal procedures for the enforcement of arbitration agreements.[6] Thus, the identical phrasing in the FAA's original procedural provisions together with its legislative history reflects a congressional intent that the two sections apply to federal courts.

Further, the United States Supreme Court does not read the FAA's procedural provisions to apply to state court proceedings. "[W]e do not hold that §§ 3 and 4 of the Arbitration Act apply to proceedings in state courts. Section 4, for example, provides that the Federal Rules of Civil Procedure apply in proceedings to compel arbitration. The Federal Rules do not apply in such state court proceedings." (*Keating, supra,* 465 U.S. at p. 16, fn. 10.) In *Volt,* the high court later confirmed that, "While we have held the FAA's 'substantive' provisions—§§ 1 and 2—are applicable in state as well as federal court [citation], we have never held that §§ 3 and 4, which by their terms appear to apply only to proceedings in federal court [citations], are nonetheless applicable in state court." (*Volt, supra,* 489 U.S. at p. 477, fn. 6.)

---

[6] The House of Representatives' report on the FAA noted: " 'This bill declares simply that such agreements for arbitration shall be enforced, and provides a procedure in the Federal courts for their enforcement.' H.R.Rep. No. 96, 68th Cong., 1st Sess., 1–2 (1924)." (*Byrd, supra,* 470 U.S. at p. 220, fn. 6.) After the enactment of the FAA, the American Bar Association, which had participated in drafting the legislation, stated that "[t]he statute establishes a procedure in the Federal courts for the enforcement of arbitration agreements. [¶] A Federal statute providing for the enforcement of arbitration agreements does relate solely to procedure of the Federal courts." (ABA Com. on Commerce, Trade & Commercial Law (1925) *The United States Arbitration Law and Its Application,* 11 A.B.A.J. 153, 154.)

Reaffirming *Volt*'s distinction between the procedural and substantive aspects of the FAA, the court further described section 1281.2(c) as "determin[ing] only the efficient order of proceedings [and] not affect[ing] the enforceability of the arbitration agreement itself." (*Doctor's Associates, supra,* 517 U.S at p. 688.)

Finally, our interpretation that the procedural provisions of the FAA and section 1281.2 do not conflict is consistent with our prior decision in *Rosenthal.* (*Rosenthal, supra,* 14 Cal.4th 394.) *Rosenthal* dealt with the differences between the procedural provisions in section 4 of the FAA (9 U.S.C. § 4), designating that a jury decides the existence and validity of an arbitration agreement, and sections 1281.2 and 1290.2, designating that a court decides that issue. We determined that (1) the wording of section 4 suggests it is limited to federal courts and (2) the state procedural rules do not frustrate or defeat section 2's policy of enforcement of arbitration agreements. (*Rosenthal, supra,* 14 Cal.4th at pp. 407–410.) We explained: "[T]he federal policy of ensuring enforcement of private arbitration agreements, centrally embodied in section 2, is not self-implementing; its effectuation requires that courts have available some procedure by which a party seeking arbitration may compel a resisting party to arbitrate. Section 4 of the [FAA] establishes one such procedure; state law may or may not provide for other equivalent or similar procedures." (*Rosenthal, supra,* 14 Cal.4th at p. 408.) "Like other federal procedural rules, therefore, 'the procedural provisions of the [FAA] are not binding on state courts . . . *provided applicable state procedures do not defeat the rights granted by Congress.*' [Citation.]" (*Rosenthal, supra,* 14 Cal.4th at p. 409, italics added.) "Our statutes do establish procedures for determining enforceability not applicable to contracts generally, but they do not thereby run afoul of the [FAA's] section 2, which states the principle of equal enforceability, but does not dictate the procedures for determining enforceability." (*Rosenthal, supra,* 14 Cal.4th at p. 410.)

Appellants rely on specific language in *Volt* and on the holdings of *Byrd* and *Moses H. Cone. Volt* stated: "Where, as here, the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA, even if the result is that arbitration is stayed *where the Act would otherwise permit it to go forward.*" (*Volt, supra,* 489 U.S. at p. 479, italics added.) Appellants argue that, in the absence of the all-encompassing state choice-of-law provision in *Volt*, the *Volt* court would have found that the FAA preempts section 1281.2(c). However, in *Volt*, the high court, for purposes of argument, simply *assumed* that the procedural rules of the FAA (9 U.S.C. §§ 3 and 4) applied in state courts. (*Volt, supra,* 489 U.S. at p. 477 ["we conclude that even if §§ 3 and 4 of the FAA are fully applicable in state court proceedings, they do not

prevent application of [Code Civ. Proc.] § 1281.2(c) to stay arbitration where, as here, the parties have agreed to arbitrate in accordance with California law"].)

Similarly, in *Byrd* and *Moses H. Cone* (federal diversity cases), the procedural rules of the FAA clearly applied to those federal court proceedings. *Byrd* required a federal district court to grant a party's motion to compel arbitration of the pendant state arbitrable claims, pursuant to sections 3 and 4 of the FAA (9 U.S.C. §§ 3, 4). (*Byrd, supra,* 470 U.S. at pp. 217–218, 223–224.) Noting the legislative history of the FAA, the court commented that the act " 'declares simply that such agreements for arbitration shall be enforced, and provides a procedure in the Federal courts for their enforcement.' H.R.Rep. No. 96, 68th Cong., 1st Sess., 1–2 (1924)." (*Byrd, supra,* 470 U.S. at p. 220, fn. 6.) Also relying on the procedural rules of the FAA, *Moses H. Cone* held that the federal district court erred in staying the federal court action seeking an order compelling arbitration, pending resolution of a concurrent state court suit. (*Moses H. Cone, supra,* 460 U.S. at pp. 21–26.) Thus, *Byrd* and *Moses H. Cone* do not address the appropriate procedure in state courts.

We must still address appellants' claim that section 1281.2(c) conflicts with the spirit of the FAA because its application would undermine and frustrate 9 United States Code section 2's policy of enforceability of arbitration agreements. They argue that, under the rule of liberal construction set forth in *Moses H. Cone,* due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause should be resolved against the application of the conflicting state rule. (*Moses H. Cone, supra,* 460 U.S. at pp. 24–25 ["The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability"].)

*Volt* answered a similar claim. There, the contractor argued that the California Court of Appeal offended the *Moses H. Cone* principle by interpreting the choice-of-law provision to mean that the parties intended the California rules of arbitration, including the section 1281.2(c) stay provision, to apply to their arbitration agreement. In rejecting that claim, the high court responded: "Interpreting a choice-of-law clause to make applicable state rules governing the conduct of arbitration—*rules which are manifestly designed to encourage resort to the arbitral process*—simply does not offend the rule of liberal construction set forth in *Moses H. Cone,* nor does it offend any other policy embodied in the FAA." (*Volt, supra,* 489 U.S. at p. 476, italics added.) The court further stated: "[W]e think the California arbitration rules which

the parties have incorporated into their contract generally foster the federal policy favoring arbitration. As indicated, the FAA itself contains no provision designed to deal with the special practical problems that arise in multiparty contractual disputes when some or all of the contracts at issue include agreements to arbitrate. California has taken the lead in fashioning a legislative response to this problem, by giving courts authority to consolidate or stay arbitration proceedings in these situations in order to minimize the potential for contradictory judgments. See Calif. Civ. Proc. Code Ann. § 1281.2(c)." (*Id.* at p. 476, fn. 5.) Because "[t]here is no federal policy favoring arbitration under a certain set of procedural rules" (*id.* at p. 476), the Court of Appeal's construction of the arguably ambiguous generic choice-of-law clause—as incorporating both the state substantive law and state pro-arbitration rules (rather than the FAA)—did not violate the *Moses H. Cone* principle. (*Volt*, at p. 476.)

In contrast, the high court, in *Mastrobuono v. Shearson Lehman Hutton, Inc.* (1995) 514 U.S. 52 [131 L.Ed.2d 76, 115 S.Ct. 1212] (*Mastrobuono*), reached a result which, at first blush, might appear to be inconsistent with *Volt*, but is not. Applying the *Moses H. Cone* principle, it found that the generic choice-of-law clause in that case incorporated the state substantive law, but not state arbitration rules. *Mastrobuono* involved the interpretation of a standard form contract between a securities brokerage firm and its customers, requiring arbitration. The choice-of-law provision provided that the contract " 'shall be governed by the laws of the State of New York.' " (*Id.* at p. 53.) The arbitration provision contained no express reference to claims for punitive damages. New York decisional law allowed courts, but not arbitrators, to award punitive damages (the *Garrity* rule).[7] A panel of arbitrators awarded punitive damages, but a federal district court and federal Court of Appeal disallowed the award. (*Mastrobuono, supra,* at pp. 54–55.)

The petitioners argued that the FAA preempted the *Garrity* rule, while the respondents relied on *Volt*, arguing that the choice-of-law provision incorporated state arbitration rules, including the *Garrity* rule. The high court responded: "At most, the choice-of-law clause introduces an ambiguity into an arbitration agreement that would otherwise allow punitive damage awards. As we pointed out in *Volt*, when a court interprets such provisions in an agreement covered by the FAA, 'due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration.' [Citations.]" (*Mastrobuono, supra,* 514 U.S at p. 62.) "We think the best way to harmonize the choice-of-law provision with the arbitration provision is to read 'the laws of the State of New York' to encompass substantive principles that New York courts would apply, *but not to include special rules limiting the authority of arbitrators*. Thus, the choice-of-law provision covers the rights and duties of

---

[7] *Garrity v. Lyle Stuart, Inc.* (1976) 40 N.Y.2d 354 [353 N.E.2d 793, 386 N.Y.S.2d 831].

the parties, while the arbitration clause covers arbitration; neither sentence intrudes upon the other." (*Id.* at pp. 63–64, italics added.)

One commentator cogently explained the seemingly inconsistent results in *Volt* and *Mastrobuono*: "In *Volt*, the state policy *furthered* the federal goal of encouraging arbitration, and thus *Moses H. Cone* did not require construing ambiguities toward applying the FAA. In *Mastrobuono*, however, the policy at issue would have directly *impeded* the FAA's goals, thus triggering the FAA preemption. As a result, it should hardly be surprising that a choice-of-law clause, in an agreement bound by the contract law and involving the arbitration rules of one state, happened to produce a different result than did a choice-of-law clause in an entirely different context." (Note, *An Unnecessary Choice of Law: Volt, Mastrobuono, and Federal Arbitration Act Preemption* (2002) 115 Harv. L.Rev. 2250, 2259–2260, fns. omitted.)

█ Unlike the *Garrity* rule addressed in *Mastrobuono*, section 1281.2(c) is *not* a special rule limiting the authority of arbitrators. It is an evenhanded law that allows the trial court to stay arbitration proceedings while the concurrent lawsuit proceeds *or* stay the lawsuit while arbitration proceeds to avoid conflicting rulings on common issues of fact and law amongst interrelated parties. Moreover, "[s]ection 1281.2(c) is not a provision designed to limit the rights of parties who choose to arbitrate or otherwise to discourage the use of arbitration. Rather, it is part of California's statutory scheme designed to enforce the parties' arbitration agreements, as the FAA requires. Section 1281.2(c) addresses the peculiar situation that arises when a controversy also affects claims by or against other parties not bound by the arbitration agreement. The California provision giving the court discretion not to enforce the arbitration agreement under such circumstances—in order to avoid potential inconsistency in outcome as well as duplication of effort—does not contravene the letter or the spirit of the FAA. That was the explicit holding in *Volt* and nothing in *Mastrobuono* casts doubt on that conclusion." (*Mount Diablo, supra,* 101 Cal.App.4th at p. 726.) Thus, we need not construe any ambiguities as to the scope of the arbitration provision against the application of section 1281.2(c).[8]

---

[8] We decline to follow *Wolsey, Ltd. v. Foodmaker, Inc.* (9th Cir. 1998) 144 F.3d 1205, in which the court relied on *Mastrobuono* and concluded that section 1281.2(c) governs the allocation of power between alternative tribunals and limits the authority of arbitrators. Accordingly, it stated that the generic choice-of-law provision did not incorporate section 1281.2(c) and precluded the federal district court from applying the state rule. We also disapprove *Warren-Guthrie v. Health Net* (2000) 84 Cal.App.4th 804 [101 Cal.Rptr.2d 260] and *Energy Group, Inc. v. Liddington* (1987) 192 Cal.App.3d 1520 [238 Cal.Rptr. 202] to the extent their holdings are predicated on the conclusion that section 1281.2(c) limits the authority of arbitrators and conflicts with the FAA.

Our opinion does not preclude parties to an arbitration agreement to *expressly* designate that any arbitration proceeding should move forward under the FAA's procedural provisions rather than under state procedural law. We simply hold that the language of the arbitration clause in this case, calling for the application of the FAA "if it would be applicable," should not be read to preclude the application of 1281.2(c), because it does not conflict with the applicable provisions of the FAA and does not undermine or frustrate the FAA's substantive policy favoring arbitration.

## CONCLUSION

For the reasons stated above, we affirm the judgment of the Court of Appeal.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Brown, J., and Moreno, J., concurred.