Filed 6/28/16 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| VIVIAN SCOTT et al.,<br><br>    Plaintiffs and Respondents,<br><br>    v.<br><br>ROBERT A. YOHO, M.D. et al.,<br><br>    Defendants and Appellants. | B265641<br><br>(Los Angeles County<br>Super. Ct. No. BC556129)<br><br>**ORDER MODIFYING OPINION<br>[NO CHANGE IN JUDGMENT]** |

It is ordered that the opinion filed herein on June 22, 2016, and certified for publication, be modified in the following particulars:

On page 2, the second sentence of the second paragraph of section II A reads, "affirmative offenses." That phrase should be replaced with, "affirmative defenses."

On page 7, in the first sentence of section II C, the word "say" should be changed to read "stay."

There is no change in the judgment.

_____

        TURNER, P. J.                                     KRIEGLER, J.

Filed 6/22/16 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| VIVIAN SCOTT et al., | B265641 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC556129) |
| v. | |
| ROBERT A. YOHO et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior court of Los Angeles County, Howard L. Halm, Judge. Reversed.

Carroll, Kelly, Trotter, Franzen, McKenna & Peabody, Mark V. Franzen and Steven J. Wysocky for Defendants and Appellants.

Cynthia Chihiak & Associates, Cynthia Chihiak and Amy R. Martel for Plaintiffs and Respondents.

# I.  INTRODUCTION

Defendants, Robert A. Yoho, M.D. and New Body Cosmetic Surgery Center, appeal from a June 18, 2015 order denying their motions to compel arbitration. Defendants seek to enforce three arbitration agreements signed by the decedent, Kenisha Parker, against plaintiffs, who are her relatives.  Plaintiffs are:  Vivian Scott, individually and as guardian ad litem for a minor, D.G.; S.T., a minor; and La'Joyce King.  Robert Lee Turner, Jr. is the guardian ad litem of S.T.  Defendants argue the three arbitration agreements are enforceable under the Federal Arbitration Act.  We conclude:  the three arbitration agreements are subject to limited preemptive effect of the Federal Arbitration Act; the 30-day rescission right in Code of Civil Procedure[1] section 1295, subdivision (c) is preempted by the Federal Arbitration Act; and thus the motions to compel arbitration should have been granted.  We reverse the order denying the motions to compel arbitration.

# II.  BACKGROUND

## A.  Allegations of the First Amended Complaint and Defendants' Answer

Plaintiffs' first amended complaint alleges causes of action for wrongful death, medical malpractice and survivorship.  Ms. Parker consulted with defendants for various plastic surgery procedures, and on September 3, 2014, Ms. Parker underwent lipoplasty and suction lipectomy.  Following the surgery, she suffered respiratory arrest and died on September 3, 2014 as a direct and proximate result of defendants' negligence and carelessness.

---

[1] Further statutory references are to the Code of Civil Procedure unless otherwise specified.

Defendants filed a general denial of the first amended complaint's allegations. Among the 23 affirmative offenses asserted, defendants alleged, "That the instant dispute arises from a matter covered by a binding arbitration agreement between the parties, and that these answering defendants desire that this matter be therefore submitted to binding arbitration in accordance with the terms of the Arbitration Agreement."

## B. *Defendants' Motion and Amended Motion to Compel Arbitration and Plaintiffs' Opposition*

### *1. The parties' legal arguments*

On July 9, 2015, defendants filed an amended motion to compel arbitration. Defendants argued: plaintiffs' wrongful death claims were subject to physician-patient arbitration agreements signed by Ms. Parker on March 8, March 11 and September 4, 2013; the three arbitration agreements applied to plaintiffs as Ms. Parker's heirs and the agreements were subject to the Federal Arbitration Act; the 30-day cancellation period in section 1295, subdivision (c) is preempted by the Federal Arbitration Act; and an open book account was created as a result of Ms. Parker's first procedure which governed future transactions between the parties. In connection with the preemption argument, defendants argued that the 30-day rescission period in section 1295, subdivision (c) is not a legal provision applicable generally to this state's contracts. Rather, section 1295, subdivision (c) applies only to health care agreements to arbitrate and thus is preempted by the Federal Arbitration Act. (*Doctor's Associates, Inc. v. Casarotto* (1996) 517 U.S. 681, 686-687 (*Doctor's Associates*); *Morrison v. Colorado Permanente Medical Group* (D.Col. 1997) 983 F.Supp. 937, 942-943 (*Morrison*); *Basura v. U.S. Home Corp.* (2002) 98 Cal.App.4th 1205, 1212-1215 (*Basura*.)

In opposition, plaintiffs argued the three arbitration agreements were unenforceable because they did not comply with section 1295. Plaintiffs contended the three arbitration agreements did not contain a provision notifying Ms. Parker of her right

3

to rescind them within 30 days of signing.  In addition, plaintiffs asserted Ms. Parker was denied her statutory right to rescind the three arbitration agreements because she died within hours of signing the third agreement.

## 2. *The evidence*

In support of their motions, defendants submitted the three physician-patient arbitration agreements, each executed by Ms. Parker.  All three arbitration agreements have identical language.  The agreements are labeled, "**PHYSICIAN-PATIENT ARBITRATION AGREEMENT**."  Article 1 of all three arbitration agreements states: "**Article 1: Agreement to Arbitrate:**  It is understood that any dispute as to medical malpractice, that is as to whether any medical services rendered under this contract were unnecessary or unauthorized or were improperly, negligently or incompetently rendered, will be determined by submission to arbitration as provided by law, and not by a lawsuit or resort to court process except as California law provides for judicial review of arbitration proceedings.  Both parties to this contract, by entering into it, are giving up their constitutional right to have any such dispute decided in a court of law before a jury, and instead are accepting the use of arbitration."  Article 2 of the arbitration agreements provides:  "**Article 2:  All Claims Must be Arbitrated:**  It is the intention of the parties that this agreement shall cover all claims or controversies whether in tort, contract or otherwise, and shall bind all parties whose claims may arise out of or in any relation to treatment or services provided or not provided by the physician including any spouse or heirs of the patient and any children, whether born or unborn, at the time of the occurrence giving rise to any claim. . . ."  Article 3 of the arbitration agreements specifies:  an arbitration demand must be in writing and communicated to all parties; each party must select a party arbitrator within a reasonable time; the party arbitrators are to select a neutral arbitrator within a reasonable time thereafter; and the patient was to pursue his or her claims with reasonable diligence.

4

Article 4 of all three arbitration agreements states: "**Article 4: Retroactive Effect:** The patient intends this agreement to cover services rendered by the physician not only after the date it is signed (including, but not limited to emergency treatment), but also before it was signed as well." In a similar vein, article 5 states: "**Article 5: Miscellaneous Provisions:** The patient intends this agreement to cover services rendered not only after the date it is signed (including, but not limited to emergency treatment), but also before it was signed as well."

Below article 5, the following appears on all three arbitration agreements: "I understand that I have the right to receive a copy of this agreement. By my signature below, I acknowledge that I have received a copy." Between this sentence and the signature lines, the following appears in all three arbitration agreements: "**NOTICE: BY SIGNING THIS CONTRACT YOU ARE AGREEING TO HAVE ANY ISSUE OF MEDICAL MALPRACTICE DECIDED BY NEUTRAL ARBITRATION AND YOU ARE GIVING UP YOUR RIGHT TO A JURY OR COURT TRIAL. SEE ARTICLE 1 OF THIS CONTRACT**[.]" The arbitration agreements are signed by Dr. Yoho's authorized representative and Ms. Parker. The bottom of all three arbitration agreements states: "A signed copy of this document is to be given to the patient. The Original is to be filed in Patient's medical records."

In addition, defendants relied on the declaration of Dr. Yoho to show the contracts evidenced a transaction involving interstate commerce. (9 U.S.C. § 2.) The issue of whether the transaction involved commerce relates to defendants' argument that the 30-day rescission right in section 1295, subdivision (c) is preempted by the Federal Arbitration Act. Dr. Yoho's May 14, 2015 declaration reveals the following. He is a physician licensed in California and doing business as New Body Cosmetic Surgery. According to Dr. Yoho, some of the medical supplies used during the liposuction procedure were shipped from out of state. Dr. Yoho stated, "Of the supplies used by my practice, roughly 20 percent were shipped from out of state. The original manufacturer of the materials is estimated to be 90 percent or more out of state, and the corporations which own the manufacturers largely have corporate headquarters out of state. I can say

5

that definitively, some of the materials used for Ms. Parker's liposuction procedure originated from out of state." In addition, Dr. Yoho advertises his medical practice through the internet. Dr. Yoho stated, "I advertise my practice of medicine to all fifty states via the internet, and have done so since 2000. My internet marketing budget is 100% of my current advertising budget. At least 10% or more of telephone calls, mail, and/or email to/from my office and relating to potential surgery or other medical treatments provided by myself, were from/to potential or existing patients residing out of state."

According to Dr. Yoho, about five percent of his patients come from outside California. Dr. Yoho declared: "My practice is comprised of approximately 5% of patients from out of state (including the states of Washington, Oregon, Florida, Georgia, Tennessee, New York, New Hampshire, Arizona, Nevada, as well as the District of Columbia) and were treated by me at my office in Pasadena, California." Dr. Yoho added, "Approximately less than 5% of my patient fees and earnings were as a result of payments made by/from patients outside of California." In addition, the medical practice has contacts with companies outside California. "My practice contracted (via U.S. mail or the internet) with approximately 15 companies, insurance providers, entities, and/or other public or private corporations whose places of business are outside the State of California. My practice regularly sends and/or receives letters, drafts, checks, inquiries, and written and telephonic communications from outside of California, and from various other states, which represents approximately 10% of all such communications in my practice." None of Dr. Yoho's sworn statements concerning the interstate aspects of his medical practice has been contradicted by plaintiffs.

Both parties relied on language in two signed contracts dated March 8, 2013, and August 14, 2013. The March 8, 2013 contract contains the following venue and jurisdiction provision: "I agree that any lawsuit that is brought against Dr. Yoho, his corporation, associates, or organization, will be tried in Pasadena, California (the 'venue' is Los Angeles Superior Court in Pasadena, the 'jurisdiction' is the State Court of California.)" Also, the March 8, 2013 contract contains the following venue and

6

jurisdiction provision that states: "I agree that any lawsuit or arbitration that is brought against Dr. Yoho, his corporation, associates, or organization, will be tried in Pasadena, California (the 'venue' is Los Angeles Superior Court in Pasadena, the 'jurisdiction' is the State Court of California[])[.]  Note, you have signed a binding arbitration contract and this above applies to any court involvement that might be necessary for arbitration, or any legal action that enters the courts."  Finally, the August 14, 2013 contract repeats verbatim the language in the immediately preceding quotation.

## *C.  Trial Court's Ruling*

On June 18, 2015, the hearing was held and the trial court denied defendants' motions to compel arbitration and say the action.  The trial court found Ms. Parker signed three arbitration agreements with defendants and that each arbitration agreement contained language required by section 1295, subdivisions (a) and (b).  The trial court found the third arbitration agreement dated September 4, 2013 was the operative agreement because it was the most recent contract.

The trial court ruled the third arbitration agreement was unenforceable under the reasoning of *Rodriguez v. Superior Court* (2009) 176 Cal.App.4th 1461, 1469 (*Rodriguez*).  The trial court found that the third arbitration agreement was unenforceable because Ms. Parker died before the section 1295, subdivision (c) 30-day rescission period expired.  The trial court rejected defendants' argument that the Federal Arbitration Act preempted section 1295, subdivision (c) and the 30-day rescission right.  The trial court found the surgical procedure did not affect interstate commerce such that federal preemption would apply.  The trial court stated:  "The other cases cited by Defendants also fail to support their argument that because approximately 20% of their medical supplies came from out of state, the Subject Incident involved interstate commerce.  [¶] Moreover, the transaction itself (liposuction procedure) was conducted wholly within the State of California.  And, the parties contracted that the venue would be Los Angeles Superior Court with the 'jurisdiction' the State of California."

7

# III. DISCUSSION

## A. *Standards of Review*

Where the facts are undisputed, the question of whether the transaction involves interstate commerce so as to implicate the Federal Arbitration Act is a question of law subject to de novo review. (*Basura*, *supra*, 98 Cal.App.4th at p. 1210; see also *Omar v. Ralphs Grocery Co.* (2004) 118 Cal.App.4th 955, 959.) Likewise, interpretation of section 1295 presents a question of law that is reviewed de novo. (*Ibid.*; *Basura*, *supra*, 98 Cal.App.4th at p. 1210.)

## B. *Federal Arbitration Act*

### 1. *The contracts at issue involve interstate commerce*

Defendants challenge the trial court's ruling that the Federal Arbitration Act did not apply to the three arbitration agreements. The trial court reasoned the liposuction procedure did not involve interstate commerce because it was conducted wholly within California and the parties contracted the venue would be the Los Angeles Superior Court with California as the jurisdiction. We respectfully disagree with the trial court's conclusion that the contracts did not evidence a transaction involving interstate commerce.

Title 9 United States Code section 2 states in part, "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." The United States Supreme Court has held: "Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements,

8

notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." (*Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.* (1983) 460 U.S. 1, 24; accord *CompuCredit Corp. v. Greenwood* (2012) 565 U.S. ___, ___ [132 S.Ct. 665, 669]; *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 235.)

The United States Supreme Court has broadly interpreted the phrase "involving commerce" in title 9 United States Code section 2 as the functional equivalent of "affecting" commerce. (*Allied-Bruce Terminix Companies, Inc. v. Dobson* (1995) 513 U.S. 265, 273-274 (*Allied-Bruce*); accord *Citizens Bank v. Alafabco, Inc.* (2003) 539 U.S. 52, 56 (*Alafabco*).) The Federal Arbitration Act's reach is expansive and coincides with that of the commerce clause. (*Allied-Bruce, supra,* at p. 274; *Perry v. Thomas* (1987) 482 U.S. 483, 490.) In *Allied-Bruce*, the high court expounded on the reach of the commerce language in title 9 United States Code section 2 as follows: "The initial interpretive question focuses upon the words 'involving commerce.' These words are broader than the often-found words of art 'in commerce.' They therefore cover more than "'only persons or activities *within the flow* of interstate commerce."' *United States v. American Building Maintenance Industries,* 422 U.S. 271, 276 (1975) (quoting *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 195 (1974)) (defining 'in commerce' as related to the 'flow' and defining the 'flow' to include 'the generation of goods and services for interstate markets and their transport and distribution to the consumer'); see also *FTC v. Bunte Brothers, Inc.,* 312 U.S. 349, 351 (1941)." (*Allied-Bruce*, *supra*, at p. 273; see *Cole v. Burns Internat. Security Services* (D.C.Cir. 1997) 105 F.3d 1465, 1471.) The use of the terminology "involving commerce" evidences the broadest possible exercise of the commerce clause power by the Congress. (*Alafabco*, *supra*, 539 U.S. at p. 56; *Shepard v. Edward Mackey Enterprises, Inc.* (2007) 148 Cal.App.4th 1092, 1097 (*Shepard*).

Our colleagues in the Third Appellate District synthesized the United States Supreme Court's application of the commerce clause in the arbitration context: "The Supreme Court revisited the [commerce clause] issue in the context of the [Federal

9

Arbitration Act] in *Alafabco, supra,* 539 U.S. 52. There, the contract was a debt restructuring agreement between an Alabama lending institution and an Alabama fabrication and construction company. (*Id.* at p. 53.) The Alabama court had not found the requisite substantial effect on interstate commerce, as required by [*United States v.*] *Lopez* [(1995) 514 U.S. 549] because there had been no showing '"that any portion of the restructured debt was actually attributable to interstate transactions; that the funds comprising that debt originated out-of-state; or that the restructured debt was inseparable from any out-of-state projects[.]"' (*Id.* at p. 55.)" (*Shepard*, *supra*, 148 Cal.App.4th at p. 1098.)

The *Shepard* court explained when the United States Supreme Court deemed the commerce clause was implicated by a general practice that substantially bears on interstate commerce: "The Supreme Court held that the Alabama court had been 'misguided' in looking for evidence that the transaction was actually in interstate commerce. (*Alafabco, supra,* 539 U.S. at p. 56.) It held that the commerce clause power could be exercised to preempt contrary state law '"in individual cases without showing any specific effect upon interstate commerce" if in the aggregate the economic activity in question would represent "a general practice . . . subject to federal control." [Citations.] Only that general practice need bear on interstate commerce in a substantial way.' (*Id.* at pp. 56-57.)" (*Shepard*, *supra*, 148 Cal.App.4th at pp. 1098-1099.)

The uncontroverted evidence shows defendants' medical practice bears on interstate commerce in a substantial way such that it falls within the scope of the Federal Arbitration Act. Approximately 20 percent of the medical supplies were shipped from out of state. Dr. Yoho declared some of the materials used for Ms. Parker's liposuction procedure originated from outside California. Defendants advertised on the internet and communicated with out-of-state patients by telephone, mail and e-mail. About five percent of defendants' patients are from outside the state. Further, the medical practice has contacts with out-of-state companies. Dr. Yoho stated: "My practice contracted (via U.S. mail or the internet) with approximately 15 companies, insurance providers, entities and/or other public or private corporations whose places of business are outside the State

10

of California. My practice regularly sends and/or receives letters, drafts, checks, inquiries, and written and telephonic communications from outside of California, and from various other states, which represents approximately 10% of all such communications in my practice." No doubt, the liposuction procedure was conducted in California by a state licensed doctor on an in-state patient. But, there is a sufficient nexus with interstate commerce to require enforcement of the three arbitration agreements under the Federal Arbitration Act. (*Marmet Health Care Center v. Brown* (2012) 565 U.S. ___, ___ [132 S.Ct. 1201, 1203-1204] [wrongful death claims against nursing homes are subject to Federal Arbitration Act]; *Summit Health, Ltd. v. Pinhas* (1991) 500 U.S. 322, 327-330 [ophthalmological services affect interstate commerce where physicians served nonresident patients, received Medicare reimbursements, and generated revenues from out-of-state sources]; *Shepard*, *supra*, 148 Cal.App.4th at pp. 1096, 1101 [a residential purchase contract involved interstate commerce where the developer used five different out-of-state building material suppliers even though virtually none of the materials used came from other states]; *Basura*, *supra*, 98 Cal.App.4th at pp. 1214-1215 [two declarations established that construction materials were received from out-of-state suppliers, non-California design professionals assisted in the project and advertising was directed at other states].)

2. *The venue and jurisdiction provisions do not displace the application of the Federal Arbitration Act to this case*

As noted, defendants argue that the section 1295, subdivision (c) 30-day rescission period is preempted by the Federal Arbitration Act. By contrast, plaintiffs argue that the Federal Arbitration Act is inapplicable because of alleged choice of law provisions in the March 8, 2013, and August 14, 2013 contracts. For clarity's purpose, we reiterate the pertinent language: "I agree that any lawsuit or arbitration that is brought against Dr. Yoho, his corporation, associates, or organization, will be tried in Pasadena, California (the 'venue' is Los Angeles Superior Court in Pasadena, the 'jurisdiction' is the State

11

Court of California[])[.]  Note, you have signed a binding arbitration contract and this above applies to any court involvement that might be necessary for arbitration, or any legal action that enters the courts."

We respectfully disagree with plaintiffs.  The foregoing language is not a generic choice of law provision which places the present case outside the ambit of the Federal Arbitration Act.  The foregoing language is unlike choice of law provisions typically found in disputes over whether an arbitration agreement is subject to enforcement under either the California or Federal Arbitration Acts.  (See *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University* (1989) 489 U.S. 468, 470 ["'[T]he Contract shall be governed by the law of the place where the Project is located.'"] (*Volt*); *Cronus Investments, Inc. v. Concierge Services* (2005) 35 Cal. 4th 376, 387 ["'This agreement shall be construed and enforced in accordance with and governed by the laws of the State of California, without giving effect to the conflict of laws provisions thereof.'"] (*Cronus Investments*); *Mount Diablo Medical Center v. Health Net of California, Inc.* (2002) 101 Cal.App.4th 711, 716 ["'The validity, construction, interpretation and enforcement of this Agreement shall be governed by the laws of the State of California.'"] (*Mt. Diablo*).)  The *Mt. Diablo* opinion described the generic choice of law provision there as broad, unqualified and all-encompassing.  (*Id.* at p. 722; see *Security Ins. Co. of Hartford v. TIG Ins. Co.* (2nd Cir. 2004) 360 F.3d 322, 328.) *Volt*, *Cronus Investments* and *Mt. Diablo* involve a different arbitration issue--the scope of a trial court's duties under section 1281.2, subdivision (c).  These cases illustrate the potential effect of a generic choice of law provision on issues relating to the duty to arbitrate and the application of Federal Arbitration Act to a particular arbitral dispute.

The language in the arbitration agreements in this case is far different from that in *Volt*, *Cronus Investments* or *Mt. Diablo*.  The agreements do not state that the arbitration agreements' enforcement are governed by California law.  Rather, the language specifies where any suit or arbitration will be litigated, which is a classic venue selection provision.  Thus, we review the *enforceability* of the 30-day rescission provision in section 1295, subdivision (c) under the Federal Arbitration Act.  Because of our

12

resolution of this issue, we need not discuss the effect of any of the federal decisions which narrowly construe parties' rights to opt out of various aspects of Federal Arbitration Act coverage. (See *Roadway Package System, Inc. v. Kayser* (3rd Cir. 2001) 257 F.3d 287, 293-300 [requiring the parties' contract evidence a "clear intent" to displace the Federal Arbitration Act with Pennsylvania law]; *Wolsey, Ltd. v. Foodmaker, Inc.* (9th Cir. 1998) 144 F.3d 1205, 1213 ["general choice-of-law clauses do not incorporate state rules that govern the allocation of authority between courts and arbitrators. . . ."]; *Fidelity Federal Bank v. Durga Ma Corp.* (9th Cir. 2004) 386 F.3d 1306, 1311-1312 [generic choice of law provision requiring the parties arbitrate in accordance with this state's laws did not evidence a "clear intent" to incorporate California's arbitration rules]; see Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2015) ¶ 5:70.2, p. 59-60.)

## C. *Enforceability of the 30-day Rescission Right*

Section 1295, subdivisions (a) through (c) contain three provisions which directly relate to this appeal. Subdivisions (a)[2] and (b)[3] require the presence of certain language

---

[2] Section 1295, subdivision (a) states: "Any contract for medical services which contains a provision for arbitration of any dispute as to professional negligence of a health care provider shall have such provision as the first article of the contract and shall be expressed in the following language: 'It is understood that any dispute as to medical malpractice, that is as to whether any medical services rendered under this contract were unnecessary or unauthorized or were improperly, negligently or incompetently rendered, will be determined by submission to arbitration as provided by California law, and not by a lawsuit or resort to court process except as California law provides for judicial review of arbitration proceedings. Both parties to this contract, by entering into it, are giving up their constitutional right to have any such dispute decided in a court of law before a jury, and instead are accepting the use of arbitration.'"

[3] Section 1295, subdivision (b) states: "Immediately before the signature line provided for the individual contracting for the medical services must appear the following in at least 10-point bold red type: [¶] 'NOTICE: BY SIGNING THIS CONTRACT YOU ARE AGREEING TO HAVE ANY ISSUE OF MEDICAL MALPRACTICE

13

in medical malpractice arbitration agreements and specified font and color requirements. (*Reigelsperger v. Siller* (2007) 40 Cal.4th 574, 578 (*Reigelsperger*); *Titolo v. Cano* (2007) 157 Cal.App.4th 310, 319.) The language, font, and color requirements specified in subdivisions (a) and (b) are present in all three arbitration agreements executed by Ms. Parker. The trial court found the arbitration agreement contained language required by section 1295, subdivisions (a) and (b).

What is at issue is section 1295, subdivision (c), which states: "Once signed, such a contract governs all subsequent open-book account transactions for medical services for which the contract was signed until or unless rescinded by written notice within 30 days of signature. Written notice of such rescission may be given by a guardian or conservator of the patient if the patient is incapacitated or a minor." (See *Rodriguez*, *supra*, 176 Cal.App.4th at pp. 1467-1472.) Our Supreme Court has held: "The purpose of section 1295 is to encourage and facilitate arbitration of medical malpractice disputes. [Citations.] Accordingly, the provisions of section 1295 are to be construed liberally." (*Reigelsperger*, *supra,* 40 Cal.4th at p. 578; accord *Ruiz v. Podolsky* (2010) 50 Cal.4th 838, 844.)

The trial court ruled the third arbitration agreement was unenforceable because Ms. Parker died before the section 1295, subdivision (c) 30-day rescission period elapsed pursuant to the holding in *Rodriguez*, *supra*, 176 Cal.App.4th at page 1469. We will discuss *Rodriguez* later in this opinion. But the issue we resolve at present is whether, *in this case*, the 30-day rescission provision is enforceable. As they did in the trial court, defendants contend the section 1295, subdivision (c) 30-day rescission right is unenforceable because the rescission right does not exist generally under California contract law and applies only in connection with an arbitration. They argue that the United States Supreme Court has held that such state laws which interfere with the federally mandated policy favoring arbitration are unenforceable. We agree.

---

DECIDED BY NEUTRAL ARBITRATION AND YOU ARE GIVING UP YOUR RIGHT TO A JURY OR COURT TRIAL. SEE ARTICLE 1 OF THIS CONTRACT.'"

14

In *Allied-Bruce*, *supra*, 513 U.S. at page 281, the United States Supreme Court held: "States may regulate contracts, including arbitration clauses, under general contract law principles and they may invalidate an arbitration clause 'upon such grounds as exist at law or in equity for the revocation of *any* contract.' 9 U.S.C. § 2 (emphasis added). What States may not do is decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause. The [Federal Arbitration] Act makes any such state policy unlawful, for that kind of policy would place arbitration clauses on an unequal 'footing,' directly contrary to the [Federal Arbitration] Act's language and Congress' intent. See *Volt Information Sciences, Inc.*, [*supra*,] 489 U.S.[] at [p.] 474.)" (See *Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1351.) In *Doctor's Associates* the high court explained when a state law applicable only to arbitration may be preempted as described in *Perry v. Thomas* (1987) 482 U.S. 483, 492, footnote 9: "In *Perry,* we reiterated: '[S]tate law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally. A state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with [the text of § 2].' [Citation].)" (*Doctor's Associates*, *supra*, 517 U.S. at p. 685; see *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC*, *supra*, 55 Cal.4th at p. 245 ["That is, the [Federal Arbitration Act] precludes judicial invalidation of an arbitration clause based on state law requirements that are not generally applicable to other contractual clauses, such as proof of actual notice, meaningful reflection, signature by all parties, and/or a unilateral modification clause favoring the nondrafting party."].) Later in *Perry*, the United States Supreme Court explained, "A court may not, then, in assessing the rights of litigants to enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law." (*Perry v. Thomas*, *supra*, 482 U.S. at pp. 482-493, fn. 9; see *Sonic-Calabasas A, Inc. v. Moreno* (2011) 51 Cal. 4th 659, 688, cert. grnted., judgment vacated *Sonic-Calabasas A Inc. v. Moreno* (2011) 563 U.S. __ [132 S.Ct. 496].)

15

In *Doctor's Associates*, the Montana Supreme Court had held that an arbitration clause in a franchise agreement was unenforceable because it failed to comply with a statutory underscoring and pagination requirements. (*Doctor's Associates*, *supra*, 517 U.S. at p. 684; see *Sanchez v. Valencia Holding Co,. LLC* (2015) 61 Cal.4th 899, 914.) The United States Supreme Court found Federal Arbitration Act preemption because the underscoring and pagination requirements did not apply to other contracts. "Courts may not, however, invalidate arbitration agreements under state laws applicable *only* to arbitration provisions. See *Allied-Bruce,* [*supra*,] 513 U.S., at 281; *Perry,* 482 U.S., at 492, [f]n. 9. By enacting § 2, we have several times said, Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed 'upon the same footing as other contracts.' *Scherk v. Alberto-Culver Co.,* [(1974)] 417 U.S. 506, 511 (internal quotation marks omitted). Montana's § 27-5-114(4) directly conflicts with § 2 of the [Federal Arbitration Act] because the State's law conditions the enforceability of arbitration agreements on compliance with a special notice requirement not applicable to contracts generally. The [Federal Arbitration Act] thus displaces the Montana statute with respect to arbitration agreements covered by the [Federal Arbitration Act]. [Citation.]" (*Doctor's Associates*, *supra*, 517 U.S. at p. 687; see *Hedges v. Carrigan* (2004) 117 Cal.App.4th 578, 584-585.)

As they did in the trial court, defendants rely upon *Basura*, *supra*, 98 Cal.App.4th at pages 1211-1212. At issue in *Basura* was section 1298.7 which states, "In the event an arbitration provision is included in a contract or agreement covered by this title, it shall not preclude or limit any right of action for bodily injury or wrongful death, or any right of action to which Section 337.1 or 337.15 is applicable." (Sections 337.1 and 337.15 set forth the statutes of limitations for specified construction defect litigation.) Section 1298.7 is construed to permit a construction defect plaintiff to pursue a civil action even though an arbitration agreement complying with section 1297, subdivision (a) through (c) was executed. As explained in *Basura*: "With respect to the impact of section 1298.7, *Villa Milano* explained: '[S]ection 1298.7 . . . provides that even when an arbitration provision is included in an agreement to convey real property, "it shall not preclude or

16

limit . . . any right of action to which . . . Section 337.1 or 337.15 is applicable." . . . [S]ections 337.1 and 337.15 pertain to litigation to recover damages for construction and design defects. *In other words, the net effect of section 1298.7 is to permit a purchaser to pursue a construction and design defect action against the developer in court, even if the purchaser signed an agreement to convey real property containing an arbitration clause*. [Citation.]' (*Villa Milano Homeowners Assn. v. Il Davorge* [(2000)] 84 Cal.App.4th [819,] 830, italics added, fns. omitted.)" (*Basura*, *supra*, 98 Cal. App.4th at pp. 1211-1212; accord *Shepard v. Edward Mackey Enterprises, Inc.*, *supra*, 148 Cal.App.4th at p. 1096.) The *Basura* court concluded; "Here, section 1298.7 directly conflicts with section 2 of the [Federal Arbitration Act] because the California statute is a state law applicable only to arbitration agreements, allowing a purchaser to pursue a construction and design defect action against a developer in court, despite having signed an agreement to convey real property containing an arbitration clause." (*Basura*, *supra*, 98 Cal. App.4th at p. 1212.)

Defendants also rely on *Morrison*, *supra*, 983 F.Supp. at pages 943-944, a case in which the plaintiffs brought suit challenging medical care provided by defendants. At issue was whether an arbitration agreement, which did not comply with text and format requirements imposed by Colorado statutory law, was subject to Federal Arbitration Act preemption. (*Id.* at p. 943.) The district court held the plaintiffs' medical malpractice related claims must be arbitrated: "The Colorado Uniform Arbitration Act, 13–22–210 *et seq.,* C.R.S., places no text or form limitations on arbitration agreements. Thus, the effect of the [Colorado Health Care Availability Act] arbitration provisions §§ 13–64–403(3) and (4) is to place arbitration clauses in medical services agreements in a class apart not only from 'any contract' but also from all other arbitration agreements. By doing so, the [Colorado Health Care Availability Act] 'singularly limits their validity.' *Doctor's Assoc.,* 517 U.S. 681, 116 S.Ct. at 1657. I hold that the [Colorado Health Care Availability Act] medical services arbitration provisions are 'inconsonant' with, and therefore preempted by, the Federal Arbitration Act. . . . ." (*Morrison*, *supra*, 983 F. Supp. at p. 943; see *Allen v. Pacheco* (Col. 2003) 71 P.3d 375, 382.)

17

We agree with defendants. The 30-day rescission period does not apply to California contracts generally. The general rescission statutes, Civil Code sections 1689 through 1695.17, provide no automatic 30-day right to rescind a contract after performance by the other side. And here, the rescission right only exists in the context of the provision of arbitration of medical care disputes. Because the 30-day rescission period applies only in the context of *arbitration* of medical care disputes, it is preempted by the Federal Arbitration Act. (*AT&T Mobility LLC v. Concepcion* (2011) 517 U.S. 333, 339; *Doctor's Associates*, *supra*, 563 U.S. at p. 687.)

### D. Rodriguez

We now turn to plaintiffs' contention based upon *Rodriguez*. In *Rodriguez,* the decedent executed a physician-patient arbitration agreement four days before her gallbladder surgery. (*Rodriguez*, *supra*, 176 Cal.App.4th at pp. 1464-1465.) The decedent died during the recovery period allegedly from a nick to her liver the surgeon made during the procedure. (*Id.* at p. 1465.) The decedent's minor child sued the surgeon and others for wrongful death. (*Ibid.*) The surgeon moved to compel arbitration. The trial court granted the petition to compel arbitration. (*Id.* at p. 1466.) Plaintiff filed a mandate petition which was granted by the Division Seven of this appellate district. (*Id.* at p. 1464.)

The Court of Appeal held the arbitration agreement was unenforceable because there was no valid waiver of the right to a jury trial. (*Rodriguez, supra,* 176 Cal.App.4th at p. 1469.) Our Division Seven colleagues explained: "[Decedent] was presented with the Arbitration Agreement only four days before her scheduled surgery under circumstances in which she could have believed she must sign the agreement in order to have [defendant surgeon] perform the surgery. There is no evidence that she would or would not have reread and reconsidered the Arbitration Agreement after her surgery or that she would or would not have exercised her right to 'revoke' the agreement within the statutory 30-day revocation period. [Citation.] [Decedent] signed the Arbitration

18

Agreement herself, not through someone authorized to do so on her behalf, and, hence, the determinative factor is [decedent's] intent, not the intent of some representative appointed after her death. [Citation.] [Decedent's] death shortly after the initial surgery rendered it impossible to make any evidentiary finding regarding whether [decedent's] alleged waiver of her rights, not to mention the child's rights, to a jury trial was knowing and voluntary. [Decedent's] death prior to the expiration of the 30-day 'cooling off' period also made it impossible for full compliance with section 1295 requirements. A statutory prerequisite to an enforceable arbitration agreement under section 1295 is that the person signing the agreement must have 30 days to review the agreement and reconsider whether he or she knowingly and voluntarily intends to waive the right to a jury trial or, alternatively, desires to rescind the agreement. (§ 1295, subd. (c).) Thus, [decedent's] death prior to the expiration of the 30-day period rendered it impossible to establish that an arbitration agreement exists that is enforceable under section 1295. Given the foregoing facts, we conclude that [defendant surgeon] would be unable to carry his burden of proving that an agreement exists. [Citation.]" (*Rodriguez v. Superior Court, supra,* 176 Cal.App.4th at pp. 1469-1470.)

In *Rodriguez* there was no issue concerning preemption by the Federal Arbitration Act. By contrast, here defendants have made a specific factual showing as to why the transaction involves interstate commerce. Our Supreme Court has explained: "'Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered. [Citation.]' (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2.)" (*Elisa B. v. Superior Court* (2005) 37 Cal.4th 108, 118.) The analysis concerning the 30-day rescission right in *Rodriguez* has no bearing on the preemption issue presented here.

## IV.  DISPOSITION

The order denying the motions to compel arbitration is reversed.  Defendants, Robert A. Yoho, M.D. and New Body Cosmetic Surgery Center, shall recover their costs on appeal from plaintiffs:  Vivian Scott, individually and as guardian ad litem for D.G., a minor; S.T., minor, by and through his guardian ad litem, Robert Lee Turner Jr.; and La'Joyce King.

**CERTIFIED FOR PUBLICATION**



TURNER, P. J.


We concur:



KRIEGLER, J.



KUMAR, J.[*]

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.