Filed 6/20/24  Rummell v. Lindsey CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA


| | |
|---|---|
| SCOTT RUMMELL et al., | D083422 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. CIVSB2200440) |
| WILLIAM RAY LINDSEY et al., | |
| Defendants and Appellants. | |


APPEAL from a judgment of the Superior Court of San Bernardino County, Michael A. Sachs, Judge.  Affirmed.

Markun Zusman & Compton, Edward S. Zusman, Kevin K. Eng and Tadeusz McMahon, for Defendants and Appellants.

Reif Law Group, Brandon S. Reif and Marc S. Ehrlich, for Plaintiffs and Respondents.

In this appeal involving a lawsuit brought by a couple against their former financial advisor, his associates, and related business entities, we affirm the trial court's denial of a motion to compel arbitration under Civil Code of Procedure, section 1281.2, subdivisions (c) and (d).[1]  In reaching this decision, the court first determined there were true third parties to the relevant arbitration agreement.  We review this question independently and concur.  As a second step, the court then made a discretionary judgment call and decided not to order arbitration due to its concern that conflicting rulings might result from adjudication of the dispute in two separate forums. We find no abuse of discretion in this step of the court's analysis.

We then consider whether the application of section 1281.2 was nonetheless erroneous given (1) the contract's choice-of-law clause, and (2) principles of federal preemption.  Because we conclude the parties selected California law to govern enforcement of their contract, we find that the Code of Civil Procedure—including section 1281.2—was fully incorporated.  Lastly, subject to controlling authority, we clarify that federal preemption does not apply in this case.  Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Although some details of the events leading up to the lawsuit underlying this appeal are tangential to this appeal, we recount them in order to clarify the identities of the various parties—a task that is critical to our analysis of the issues before us.

---

[1]    Further undesignated statutory references are to the Code of Civil Procedure.

[2]    Most of the facts are drawn from the complaint.  We describe them as alleged simply to provide an orientation to the dispute.

### The Parties

Plaintiffs Scott and Terry Rummell amassed considerable assets in the course of their careers, in no small part due to Scott's success as a notable voiceover actor. The Rummells' good fortune meant they were interested in obtaining financial advice when they met William Ray Lindsey around 2004. Lindsey presented himself as a tax and retirement expert who usually worked with very high net worth clients, but was allegedly willing to make an exception for the Rummells' more modest portfolio. The couple connected with Lindsey over their shared Christian faith, and they soon retained the financial advisor for his services, namely "comprehensive and optimal financial, tax, and charitable giving planning." According to the Rummells, one of their primary financial objectives was to minimize their tax burden in order to maximize their charitable giving. They retained Lindsey as their financial advisor until 2019, when the Rummells allege they discovered his professional misconduct.

Although the Rummells assert they were unaware of Lindsey's wrongdoing for many years, some issues apparently arose at the outset of the relationship. Around 2005, Lindsey introduced the Rummells to Michael Meyer, an attorney and self-professed tax expert peddling what he termed the "Ultimate Tax Plan." Meyer's scheme, which Lindsey and Meyer marketed to the Rummells, involved counseling clients to: (1) create a new entity, such as an LLC (Entity A), (2) transfer various noncash assets to Entity A, such as interests in real property, (3) assign assets from Entity A to a tax-exempt entity (Entity B), and (4) write off the transfer as a donation in order to claim large deductions and avoid paying federal income tax.[3]

---

[3] Meyer apparently represented to his clients, including the Rummells, that they could retain control of their assets under the Ultimate Tax Plan by

When he met them, Meyer apparently assured the Rummells that he had visited their church and shared their faith, a gesture they claim won their trust.

The Rummells adopted Meyer's scheme, working with him and Lindsey to create Rummell Family Holdings, LLC (RFH), which they funded with real estate, royalty rights, and intellectual property from Scott's studio voice-over business, My Voices, LLC (My Voices).[4] RFH then donated significant assets (in the form of nonvoting membership units) to National Endowment Association, Incorporated (NEA), a sham charitable donor advised fund (DAF).[5] Lastly, the Rummells transferred voting membership units to a family trust, the Rummell Family Gift Trust (RGT), and took a large deduction for the donation to NEA.[6] Because Meyer had fraudulently appraised the intellectual property as worth over four million dollars, the membership units had an inflated value and enabled the Rummells to take

---

dividing the transferred assets into shares, the bulk of which were "non-voting shares" with a minority of "voting shares," and then transferring only nonvoting shares to Entity B.

[4] The Rummells transferred these assets, and others of like kind, through a web of cash payments between their entities and themselves and issuing promissory notes for the remaining balance.

[5] Donor advised funds allow donors to give assets in a particular year, which are then held in the fund, and determine later how their gift should be distributed; DAFs thus "enable[ ] a donor to get an immediate tax deduction but defer the actual donation of the funds to individual charities until later." (*Fairbairn v. Fidelity Investments Charitable Gift Fund* (N.D. Cal., Feb. 26, 2021, No. 18-cv-04881-JSC) 2021 WL 754534, p. *2.)

[6] NEA's Internal Revenue Code section 501(c)(3) (hereafter 501(c)(3)) status was later revoked.

a deduction for close to half a million dollars that year.[7]  Under this scheme, the Rummells planned to transfer a certain amount of assets each year and continue taking large deductions.

Sometime around 2007, Lindsey also introduced the Rummells to Mark Pearson, an investment advisor.  Lindsey and Pearson apparently convinced the Rummells to move about 50 percent of their investment portfolio from Merrill Lynch to Nepsis, which was Pearson's investment company.  Later, Pearson and Lindsey presented the Rummells with various investment opportunities that appear to have been riddled with undisclosed conflicts of interest.

Perhaps as a result of these activities, the Rummells were audited in 2009.  The IRS disallowed $900,000 of their "charitable" contributions and penalized them $540,000.  The Rummells nonetheless claim that "these events did not reduce [their] trust in [Lindsey and Meyer]."[8]  Despite incurring penalties for these activities, they repeated the same scheme with new entities in 2010, donating significant assets from My Voices to National Outreach Foundation Incorporated (NOFI), another DAF.[9]  They also dissolved My Voices and created a new LLC, Big Mouth, to house the assets that had once belonged to the former.

---

[7]     The Rummells put the onus on Lindsey for this, maintaining they were unaware that Meyer was the appraiser Lindsey hired, or that the appraisal was inflated.

[8]     The Rummells allege that Lindsey convinced them the government's interest in their activities stemmed from a " 'witch-hunt' " against them, or perhaps Meyer, due to their Christian faith.

[9]     NOFI was apparently run by a man named Gordon Young until he died in 2018, at which point Lindsey allegedly took over its operations.  It was decertified as a 501(c)(3) organization in 2014, with that revocation applying retroactively back to 2005.

Although it appears they had never previously used a formal contract, Lindsey asked the Rummells to sign a client services agreement in 2018. They obliged, signing in their individual capacities, while Lindsey signed on behalf of Lindsey Financial, his advisory firm. That contract contains an arbitration clause which we discuss in more depth below.

In 2018, the IRS charged Meyer with operating a national tax scam using precisely the strategies he implemented with the Rummells. (*United States v. Meyer* (11th Cir. 2022) 50 F.4th 23, 25 (*Meyer*).) Meyer settled with the government under terms that permanently enjoined him from tax-advising activities, forced the closure of all entities he directly or indirectly controlled, and obligated him to turn over the names of his clients and business partners to the IRS. Meyer's prosecution triggered another audit of the Rummells in 2019 that Lindsey apparently handled on their behalf. According to the Rummells, it was only in June of 2020 that they finally began to question Lindsey's advice and, eventually, discover his prolific misconduct.

### *Proceedings in the Trial Court*

In 2022, the Rummells and their related entities (Big Mouth, RFH, and RGT) filed a lawsuit against Lindsey, Meyer, Pearson, and several associated entities: Lindsey Financial, Lindsey Financial Group, Lindsey Financial & Insurance Services Blue Sky, NEA (referred to collectively as the Lindsey defendants), NOFI, and Nepsis. The plaintiffs alleged the defendants mounted "a three-pronged assault" against them by (1) drawing them into the tax fraud, (2) directing them to purchase multiple life insurance policies

6

in an "insurance twisting" scheme,[10] and (3) pressuring them into unwise private loans from which the defendants illicitly benefitted.[11] They generally claimed that Lindsey, Pearson, and Meyer conspired together, taking fees, commissions, and kickbacks from successfully marketing each other's services to the Rummells. Furthermore, the plaintiffs asserted these men and their respective entities functioned as alter egos and agents of one another, though they cast Lindsey as the "ringleader of the misconduct." All told, plaintiffs claimed they lost at least $5,150,000.[12]

In response to the lawsuit, the Lindsey defendants brought a motion to compel arbitration, relying on the 2018 contract. Although it was signed only by Scott and Terry Rummell as individuals, and William Lindsey on behalf of Lindsey Financial, the Lindsey defendants asserted it was sufficient to cover the entire dispute. In making this argument, they pressed the trial court to credit the allegations of the complaint—which cast all the defendants as agents, coconspirators, or alter egos of each other. Under this theory, the Lindsey defendants claimed there were no true nonsignatories to the arbitration agreement involved in the suit.

The trial court was unconvinced. In particular, it noted there was no evidence that defendants such as Blue Sky and NEA were mere alter egos or

---

[10] Typically, "twisting" or "churning" insurance is a scheme where an insurance agent convinces a client to purchase a new policy by misrepresenting its benefits, enabling the agent to earn additional commissions. (See *U.S. v. Forzese* (1st Cir. 1985) 756 F.2d 217, 219 ["Twisting benefits an insurance agent while damaging the customer."].)

[11] Some of these loans were brokered by Blue Sky, a commercial loan entity purportedly run by Lindsey's wife.

[12] The complaint asserted six specific causes of action: breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of contract, common law fraud, professional negligence, and constructive fraud.

agents of the signatory, Lindsey Financial.  Even assuming all the Lindsey defendants and the Rummell plaintiffs could proceed to arbitration, the court expressed concern that litigation involving the remaining defendants would lead to conflicting rulings.  Due to this risk, the court elected to exercise its discretion under section 1281.2, subdivisions (c) and (d) to deny the motion.[13]

The Lindsey defendants now appeal that decision.[14]

## DISCUSSION

The Lindsey defendants' arguments distill down to three points.  First, they assert that the court erred in applying section 1282.1 because there were no true nonsignatories to the arbitration agreement named in the lawsuit.  They devote much of their brief to arguing that the allegations of the complaint must be credited in this analysis—particularly the general theme that the defendants functioned as agents and alter egos of each other.

Second, they argue that California law (and therefore section 1281.2) does not apply in this case because the parties' choice-of-law clause in the contract evidences no intention to incorporate California law.  They claim it shows only an intent to incorporate two other bodies of law:  the Superior Court of San Bernardino County Local Rules (San Bernardino Local Rules)

---

[13]     In pertinent part, section 1281.2, subdivision (c) gives the court authority to refrain from sending part of a dispute to arbitration, despite the existence of an arbitration agreement, when:  "A party to the arbitration agreement is also a party to a pending court action or special proceeding with a third party, arising out of the same transaction or series of related transactions and there is a possibility of conflicting rulings on a common issue of law or fact."  When this kind of risk arises, subdivision (d) provides four options for the trial court to choose between in its discretion to mitigate the possibility of conflicting rulings.

[14]     Meyer, Pearson, and Nepsis are respondents in the appeal, but filed no briefs.  NOFI appears to have defaulted below by not answering and is not a party.

8

and the Financial Industry Regulatory Authority (FINRA) Code of Arbitration Procedure. From there, the Lindsey defendants argue California law is excluded by the more specific election of the San Bernardino Local Rules. And since the latter are silent regarding "resolving motions to compel arbitration," they propose that only federal law remains to fill the gap. But since the Federal Arbitration Act (FAA) (9 U.S.C. §§ 1–16) contains no provision similar to section 1281.2, they assert there was no basis to deny arbitration. In the alternative, they challenge section 1281.2 as preempted by the FAA.

As we explain below, none of these arguments prevail. The allegations of a complaint, unproven as they are, do not transmute nonsignatories of an arbitration agreement into signatories. Having correctly identified that there were third parties in the case, the trial court did not then abuse its discretion by applying section 1281.2 to resolve the risk of conflicting rulings.

Regarding the parties' choice of law, we begin with the language of that clause and find they unambiguously elected California law to govern the enforcement of any disputes arising from their contract. This body of law acts in concert with, not to the exclusion of, the San Bernardino Local Rules. Insofar as the parties also indicated they preferred the FINRA rules, these would apply in the context of active arbitration, not before. Consequently, the court's application of section 1281.2 was proper.

Turning finally to the federal preemption argument, we conclude section 1281.2 does not conflict with the FAA (either on its face or as applied) under controlling United States Supreme Court authority. In a case such as this one, where the parties selected California law, the trial court merely upheld their selection by applying California's code provisions governing arbitration, of which section 1281.2 is a part.

9

**A.**   *Standard of Review*

When a trial court decides to refrain from ordering a case to arbitration under section 1281.2, subdivisions (c) and (d), it makes two separate decisions.  First, it faces a "threshold determination of whether there are non-arbitrable claims against at least one of the parties to the litigation (e.g., a nonsignatory)." (*Rowe v. Exline* (2007) 153 Cal.App.4th 1276, 1288.)  If it finds there is a third party involved such that adjudication in separate forums might lead to conflicting rulings, then section 1281.2, subdivision (c) applies.  This permits the court, in its discretion, to take one of four courses of action—including declining to enforce an arbitration agreement that would otherwise apply to some of the parties or claims.  (§ 1281.2, subd. (d).)[15]

Reviewing these two steps implicates two different standards of review.  As a question of law, we review the threshold consideration of whether a third party exists de novo.  (*Rowe v. Exline* (2007) 153 Cal.App.4th 1276, 1283; *Laswell v. AG Seal Beach, LLC* (2010) 189 Cal.App.4th 1399, 1406.)  If we find a third party does exist, we then review the trial court's decision to deny or defer sending a case to arbitration for an abuse of discretion.  (*Ibid.*; *Molecular Analytical Systems v. Ciphergen Biosystems, Inc.* (2010) 186 Cal.App.4th 696, 708.)

**B.**   *There Were Third Parties Involved in the Lawsuit.*

Because this threshold question turns on the identities of the various parties, we start with an overview of the plaintiffs.  The lawsuit at issue was

_____

[15]    The court "(1) may refuse to enforce the arbitration agreement and may order intervention or joinder of all parties in a single action or special proceeding; (2) may order intervention or joinder as to all or only certain issues; (3) may order arbitration among the parties who have agreed to arbitration and stay the pending court action or special proceeding pending the outcome of the arbitration proceeding; or (4) may stay arbitration pending the outcome of the court action or special proceeding."  (§ 1281.2, subd. (d).)

brought by Scott and Terry Rummell, as individuals, and the three entities they manage: Big Mouth (formerly My Voices), RFH, and RGT. These are, respectively, two LLCs and the Rummell family trust, for which Scott and Terry serve as cotrustees.

These are all closely held entities, and we are inclined to credit the Lindsey defendants' point that they are not distinct enough to exclude them from an arbitration agreement signed by the Rummells for the purpose of obtaining financial advising services. This is particularly apparent when we consider that they were formed in the course of the Rummells following Lindsey's financial advice. If we were to deem them true nonsignatories, that would yield a strange result where an arbitration agreement between a financial advisor and his advisees would be nullified by the creation of entities that were, in actuality, more akin to financial tools suggested by the advisor in furtherance of his advisees' goals.

A hypothetical illustration further demonstrates the true nature of these entities. If the four Rummell plaintiffs had named only Lindsey Financial as the sole defendant, and Lindsey Financial then moved to compel arbitration, the Rummells would be hard pressed to defend the inclusion of their LLCs and their family trust as anything more than artful pleading.[16] In our independent estimation, the presence of the Rummell entities as

---

[16] We make this observation only in the context of reviewing the issue before us. There are arguably other theories under which the arbitration agreement might not cover the Rummell entities. For example, the Rummells asserted in the trial court that the May 2018 agreement did not cover events that occurred before it was signed (and indeed, it contains no language indicating it would be retroactive). The trial court never ruled on this point, however, because it denied the motion to compel arbitration on other grounds.

11

plaintiffs does not expand the controversy beyond the scope of the arbitration clause.

The defendants, however, are another matter. Even if we assume, as the trial court did, that (1) Lindsey as an individual, (2) Lindsey Group, and (3) Lindsey Insurance could all be considered part of the signatory Lindsey Financial, we are still left with several nonsignatory defendants. Taking this a step farther and assuming all the "Lindsey defendants," including Blue Sky and NEA, come under the umbrella of the parties represented by Lindsey Financial's signature, the problem of nonsignatory defendants persists with Meyer, Pearson, and Nepsis.[17] There is simply nothing in the record that would justify wedging these defendants into the arbitration agreement as implied signatories.

At its heart, an arbitration agreement is a contractual commitment. (*Freeman v. State Farm Mut. Auto. Ins. Co.* (1975) 14 Cal.3d 473, 479 ["A proceeding to compel arbitration is in essence a suit in equity to compel specific performance of a contract."].) In enforcing contracts, it is just as essential for courts to understand and effectuate the original agreement of the parties as it is to respect the separateness of nonparties and avoid requiring them to perform terms they never agreed to. That is why (with few exceptions not relevant here) nonparties to a contract's formation generally are not subject to its trappings and cannot avail themselves of its benefits after the fact. (See *Goonewardene v. ADP, LLC* (2019) 6 Cal.5th 817, 828–829 [discussing the third-party beneficiary exception to the general rule that only contracting parties can bring enforcement actions].) Neither the conspiracy allegations of the complaint, nor the Lindsey defendants' assertion

---

17    We do not address defendant NOFI because it appears NOFI never responded in the trial court.

that the remaining defendants would happily consent to arbitration, can make Meyer, Pearson or Nepsis proper parties to the 2018 contract.

To further illustrate this point, we consider Meyer. Apart from the general allegation that Lindsey and Meyer operated as agents of each other and that Lindsey was the "ringleader," there is nothing to suggest that Meyer operated his scheme at the behest of Lindsey. And indeed, this suggestion is contradicted by the terms of Meyer's settlement with the IRS. The judgment entered against Meyer in that case contains a list of tax-exempt entities he controlled. For each of these entities, Meyer was ordered to (1) disclaim any interests the entity previously accepted from individuals "in connection with the Ultimate Tax Plan," (2) provide an accounting, (3) "return the funds retained in their bank accounts . . . to the individuals or Entities from which the funds originated" and, finally, (4) "close all bank accounts, and dissolve." He was also ordered to send a copy of his judgment to any financial planner or financial industry professional with whom he worked to promote the Ultimate Tax Plan. This order would make little sense if anyone but Meyer was in control of his scheme, or if he truly worked under the leadership of one of his industry partners. Because the settlement occurred only after the government's "extensive discovery" into Meyer's activities (*Meyer, supra,* 50 F.4th 23, 25), it seems reasonable to believe it reflects a proper understanding of Meyer's relationship to his sham nonprofit entities and his business associates. There is plainly insufficient evidence that Meyer's financial misconduct was so closely tied to Lindsey that he should be considered an alter ego of Lindsey Financial.

Pearson and Nepsis are no different. While we have decidedly less information about them in the record, there is no more tying Pearson and Nepsis to the Lindsey entities in this case than the fact that Lindsey

13

introduced Pearson to the Rummells and together they pitched various investment opportunities to the couple. Apart from pointing to the general assertions in the complaint that all the defendants acted as "agent[s] . . . co-conspirator[s] . . . affiliate[s] and/or alter ego[s]" of each other, the Lindsey defendants offer nothing more to demonstrate that Pearson or Nepsis operated as part of the Lindsey entities.

The Lindsey defendants cannot rely solely on the allegations of the complaint to draw these third parties into their orbit.[18] "[P]leadings are allegations, not evidence, and do not suffice to satisfy a party's evidentiary burden." (*Soderstedt v. CBIZ Southern California, LLC* (2011) 197 Cal.App.4th 133, 154.)

---

[18] The Lindsey defendants point to *Laswell v. AG Seal Beach, LLC* (2010) 189 Cal.App.4th 1399, 1402–1404, where the appellate court reversed the denial of a motion to compel arbitration after finding various defendants were related enough to enforce an arbitration agreement. But the facts of this case are too dissimilar, and the reversal did not depend entirely on the allegations of the complaint. In *Laswell*, an elderly plaintiff who allegedly suffered abuse and neglect in a care facility sued the healthcare facility itself, its parent company, its management company, and the company in charge of daily operations. The appellate court's conclusion that these were essentially the same entity for purposes of the arbitration agreement was based on the actual relationship between these businesses in operating the care facility. That the allegations stated as much only reflected reality. (*Id.* at p. 1407.)

Having determined that the court made no legal error in deciding there were third parties involved in the suit, we turn now to the question of whether the court abused its discretion by denying the Lindsey defendants' motion to compel arbitration.

**C.**   ***The Trial Court Did Not Abuse Its Discretion by Denying the Motion to Compel Arbitration.***

The Lindsey defendants offer scarce argument as to how the court might have abused its discretion under section 1282.1. They generally state there would be "little risk" of inconsistent rulings because Pearson and Nepsis were willing to submit to arbitration while NOFI had been defaulted. They do not mention Meyer.[19] They further argue that because caselaw includes precedent allowing certain nonsignatories who were alleged alter egos to enforce arbitration agreements, that logic should apply here.[20] Lastly, they suggest that because the court *could* have sent some claims to arbitration, it *should* have.

None of these arguments are availing. As plaintiffs point out, it does not matter under section 1281.2 how severe the risk of conflicting rulings might be; a court need only determine there is "a possibility of conflicting rulings on a common issue of law or fact" to exercise its discretion to avoid

_____

[19]   At the hearing on the motion to compel arbitration, counsel for Pearson and Nepsis suggested Meyer was no longer part of the case. The court checked the register of actions and corrected counsel, noting Meyer was "still in the case."

[20]   The Lindsey defendants cite to *Rowe v. Exline* (2007) 153 Cal.App.4th 1276, 1290, which vindicated two nonsignatories who were former officers and alleged alter egos of a signatory entity in compelling arbitration with a third former officer. The problem the appellate court corrected in *Rowe* is not similar to the one here. If the trial court had denied a motion brought by Lindsey to compel arbitration on the basis that only Lindsey Financial was a signatory, that would be much more akin to the issue in *Rowe*.

15

that outcome. (*Id., s*ubd. (c).) That some of the nonsignatories involved would submit to arbitration is also of no relevance. Lastly, the fact that the court could have reasonably made a different decision does not demonstrate an abuse of discretion. (See *Walker v. Superior Court* (1991) 53 Cal.3d 257, 272 [an abuse of discretion "exceeds the bounds of reason"].) The burden is on the party complaining of an abuse of discretion to establish that one occurred, and the Lindsey defendants have not done so here. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.)

**D.** ***The Parties Chose California Law to Govern their Agreement, Including Section 1281.2.***

As with any contract, the parties to an agreement that includes an arbitration clause may generally choose which laws they want to govern if a conflict arises. The 2018 contract between the Rummells and Lindsey Financial contains just such a choice-of-law clause that reads as follows:

> "Choice of Law - California law, and specifically the Local Rules of Court of the Superior Court of California County of San Bernardino, shall govern the interpretation and enforcement of this Agreement."

In an effort to undermine the use of section 1281.2, the Lindsey defendants argue this clause reflects no intent to incorporate California law. Glossing over the clear reference to "California law" at the outset, they claim this paragraph indicates only a selection of the San Bernardino Local Rules. In taking this bizarre position, they suggest a binary choice between state law and the San Bernardino Local Rules—two bodies of authority that, in actuality, work in harmony together. Moreover, when these laws conflict, state law takes precedence. (*Contractors Labor Pool, Inc. v. Westway Contractors, Inc.* (1997) 53 Cal.App.4th 152, 169 ["To the extent a local rule conflicts with a state statute, the rule is invalid."].)

16

In our view, this clause straightforwardly elects California law to govern *interpretation* and *enforcement* of the entire contract. To decide otherwise would be to render superfluous the first part of the clause that clearly states, "California law." That this sentence continues on to specify the San Bernardino Local Rules indicates nothing more than that the parties preferred using that local court system and its procedures as a forum, if necessary.

Interpreting similar contractual language, the court reached the same conclusion in *Mount Diablo Medical Center v. Health Net of California, Inc.* (2002) 101 Cal.App.4th 711 (*Mount Diablo*) specifically with respect to the application of section 1281.2. In that case, the choice-of-law provision in the contract stated that California law would govern " '[t]he validity, construction, interpretation and enforcement of this Agreement.' " (*Mount Diablo,* at p. 722.) Focusing on the term "enforcement," the court observed that in the California code, the title and chapter where section 1281.2 appears "is captioned 'Enforcement of Arbitration Agreements.' " (*Mount Diablo,* at p. 722.) In deciding this language incorporated the challenged code section, the court reasoned that an interpretation of the choice-of-law clause that "exclude[d] reference to this chapter would be strained at best." (*Ibid*.) The California Supreme Court approved this reasoning (*Cronus Investments, Inc. v. Concierge Services* (2005) 35 Cal.4th 376, 387 (*Cronus*)), and it applies with equal force to the facts of our case.

The Lindsey defendants raise yet another variation on this same argument by pointing to the selection of FINRA rules in the contract's arbitration section. Under the heading "Arbitration," the parties checked the box indicating they would settle conflicts by arbitration "[i]n accordance with the FINRA Code of Arbitration Procedure." Far from excluding California

17

law, this election merely indicates that *if the parties proceeded to arbitration*, the FINRA procedural rules would apply in that forum. Nothing about selecting FINRA for that purpose is inconsistent with the broader choice of California law to govern the interpretation and enforcement of the entire contract.

## E. *The FAA Does Not Preempt Section 1281.2.*

In search of another angle from which to attack the trial court's denial of their motion, the Lindsey defendants offer a third challenge, suggesting that section 1281.2 is preempted by the FAA—if not outright, then as applied in this case. To make sense of this argument, we first provide some background regarding when the FAA preempts state laws governing arbitration.

"In 1925, Congress passed the FAA to 'overrule the judiciary's longstanding refusal to enforce agreements to arbitrate' (citation), and to place arbitration agreements ' "upon the same footing as other contracts." ' " (*Cronus, supra,* 35 Cal.4th 376, 383 (*Cronus*).) The FAA does not grant "special status" to arbitration clauses, but rather aims to ensure they are " 'as enforceable as other contracts, but not more so.' " (*Cronus,* at p. 384, quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.* (1967) 388 U.S. 395, 404, fn. 12.) When state law otherwise governs a contract, the FAA preempts state arbitration provisions only when the relevant code section "actually conflicts with federal law—that is, to the extent that it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " (*Volt Info. Scis. v. Bd. of Trs.* (1989) 489 U.S. 468, 477 (*Volt*), quoting *Hines v. Davidowitz*, 312 U.S. 52, 67.)

The United States Supreme Court has already considered whether section 1281.2 of California's Code of Civil Procedure "undermine[s] the goals

18

and policies of the FAA" and found it does not. (*Volt, supra,* 489 U.S. 468, 478.) In reaching this conclusion, the Court reasoned that the FAA is not frustrated by arbitration procedures that differ from the procedures of the FAA itself. "Where, as here, the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA, even if the result is that arbitration is stayed where the [FAA] would otherwise permit it to go forward." (*Volt,* at p. 479.) In other words, it does not matter that the FAA has no corollary to section 1281.2. Because the broader California statutory scheme that section 1281.2 is part of—the California Arbitration Act (§ 1280 et seq.)—encourages enforcement of arbitration agreements, it does not undermine the FAA or prompt preemption.

The Lindsey defendants argue that *Preston v. Ferrer* (2008) 552 U.S. 346 is controlling here. In doing so, they appear to either misread or disregard the clear holding in *Volt* that, where the parties have chosen California law to govern their contract, a court's application of section 1281.2 does not conflict with the FAA. *Preston* does nothing to change that and is broadly inapposite to this case.[21] It involved a different question of whether a California law that vested primary jurisdiction to hear certain conflicts in an administrative body undermined the FAA by disfavoring and restricting arbitration. In finding the FAA preempted such a structure, the Court

_____

[21]    *Preston* was guided by another United States Supreme Court opinion, *Mastrobuono v. Shearson Lehman Hutton* (1995) 514 U.S. 52, 55, which has sometimes been erroneously pitted against *Volt.* While this perceived conflict is not relevant here, we direct interested readers to *Mount Diablo*'s discussion of *Volt* and *Mastrobuono* (*Mount Diablo, supra*, 101 Cal.App.4th 711, 717–722), as well as the following law review article, for clarification: *Note, An Unnecessary Choice of Law: Volt, Mastrobuono, and Federal Arbitration Act Preemption* (2002) 115 Harvard Law Review 2250.

clarified that states cannot elevate other forums—either judicial or administrative—above arbitration. (*Preston,* at p. 359.) Even a choice-of-law clause electing such a system cannot save a "special rule[ ] limiting [arbitrators'] authority." (*Id.* at p. 362.) But section 1281.2 is not one of these prohibited rules. It is, rather, "an evenhanded law" that allows the trial court to deal practically with the threat of conflicting rulings as "part of California's statutory scheme designed to enforce the parties' arbitration agreements, as the FAA requires." (*Cronus, supra*, 35 Cal.4th 376, 393; see also *Volt, supra*, 489 U.S. 468, 476 [California's arbitration rules are "manifestly designed to encourage resort to the arbitral process"].)

The irony of applying the FAA to preempt section 1281.2 in cases such as this, where the parties elected California law to govern enforcement of their agreement, is that it would undermine the very right of parties to contract on their own terms that the federal act restores and safeguards. (See *Volt, supra,* 489 U.S. 468, 472.) The FAA "simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." (*Volt,* at p. 478.) The trial court here did nothing less by applying section 1281.2.

## DISPOSITION

We affirm the order denying the motion to compel arbitration. Plaintiffs shall recover costs on appeal.

DATO, J.

WE CONCUR:

McCONNELL, P. J.

KELETY, J.