Filed 9/19/24

CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| JAMES MAXWELL et al.,<br><br>    Plaintiffs and Respondents,<br>v.<br><br>ATRIA MANAGEMENT COMPANY, LLC, et al.,<br><br>    Defendants and Appellants. | A168043<br><br>(San Mateo County<br>Super. Ct. No. 22-CIV-03985) |

Trudy Maxwell was a 93-year-old resident of Atria Park of San Mateo (Atria) who died after she drank an industrial strength cleaner that had been poured into a beverage pitcher by an Atria employee and served to her and several other residents. Trudy's eight surviving children, including James Maxwell III (James III) (collectively, Trudy's children or the children), along with James III acting as successor in interest to Trudy's estate (plaintiffs), filed this action for damages against numerous Atria-connected individuals and entities (collectively, the Atria defendants). The trial court denied the Atria defendants' motion to compel arbitration, concluding, among other things, that James III was not authorized to sign the arbitration agreement executed in connection with Trudy's admission to Atria because, as the holder of a durable power of attorney (DPOA), he was not authorized to make health care decisions for Trudy. Instead, Trudy's daughter, Marybeth, held Trudy's power of attorney for health care (health care POA).

On appeal, the Atria defendants challenge the trial court's denial of their motion to compel arbitration on numerous grounds. They argue that, as holder of the DPOA, James III did have authority to sign the arbitration agreement, and Marybeth did not. They also contend that, under the terms of the arbitration agreement, all of Trudy's heirs are bound to arbitrate their wrongful death claims. Finally, they assert Code of Civil Procedure[1] section 1281.2, subdivision (c) (section 1281.2(c)), which allows an exception to arbitration when third party claims may be affected, is preempted by the Federal Arbitration Act (9 U.S.C. § 1 et seq.; FAA) or, at the very least, was improperly applied on these facts.

We will reverse the order denying arbitration and remand for further proceedings consistent with this opinion and the Supreme Court's recent decision in *Harrod v. Country Oaks Partners, LLC* (2024) 15 Cal.5th 939 (*Harrod*) (petn. for cert. filed June 26, 2024).[2]

## I. BACKGROUND

### A. *Relevant Facts*

In 1999, Trudy signed a durable power of attorney for health care, naming her husband, James H. Maxwell (husband), as her agent to make health care decisions. The document designated James III as her first alternate agent and Marybeth as the second alternate. Thereafter, Trudy signed an advance care directive in 2005, again naming her husband as her agent to make health care decisions. James III was again named as the first alternate, and Marybeth was the second alternate. In 2015, Trudy executed

---

[1] All undesignated statutory references are to the Code of Civil Procedure.

[2] *Harrod* was decided while this appeal was pending. We requested and received supplemental briefing from both parties regarding its impact, if any, on this case.

2

the health care POA prepared under Probate Code section 4701 that is at issue in this case. Her husband was named as her agent for health care decisions for a third time. The POA defined health care decisions in accordance with the statute to include the authority to (1) "[c]onsent or refuse consent to any care, treatment, service, or procedure to maintain, diagnose, or otherwise affect a physical or mental condition"; (2) "[s]elect or discharge health care providers and institutions"; (3) "[a]pprove or disapprove diagnostic tests, surgical procedures, and programs of medication"; (4) "[d]irect the provision, withholding, or withdrawal of artificial nutrition and hydration and all other forms of health care, including cardiopulmonary resuscitation"; and (5) "[m]ake anatomical gifts, authorize an autopsy, and direct disposition of remains." (Compare Prob. Code, § 4701.) This time, Marybeth was named the first alternate agent and another daughter, Melanie, was the second alternate. The healthcare POA was to become effective when Trudy's "primary physician determines that I am unable to make my own health care decisions." The health care POA did not identify a specific "primary physician." It revoked "any prior advance health care directive, any prior durable power of attorney for health care and any prior nomination of conservator."

On the same day she executed the health care POA, Trudy also signed the DPOA that applies in this case. The DPOA includes broad authority to handle all types of business and financial matters, including the ability to act for Trudy "in any and all ways in any business in which" she might be "interested in any way"; to execute any contracts or "other instruments in writing of every kind and description"; and, most relevant here, "[t]o commence, prosecute or enforce or to defend, answer or oppose all actions, suits or other legal proceedings of every kind and description in which [Trudy

3

is] now or may become engaged or interested in any way" and "to compromise, refer to arbitration or to submit to judgment in any such action or proceedings whether before or after suit may be actually commenced." The DPOA also generally grants Trudy's attorney in fact "full power and authority to do and perform all and every act and thing which may be necessary or convenient in connection with any of the" powers it describes "as fully, to all intents and purposes, as [Trudy] might or could do if personally present," and "ratif[ies] and confirm[s] all that [her] said attorney-in-fact shall lawfully do or cause to be done by authority hereof."

The DPOA initially appointed Trudy's husband as her attorney in fact. However, if he was "unwilling or unable to serve," the DPOA appointed James III as successor attorney in fact. Marybeth was appointed as James III's successor. For any successor to function as the attorney in fact, the DPOA required one of several documents to be attached to it—such as a certified death certificate—to demonstrate the basis for the successor's authority.[3] The DPOA also revoked any prior powers of attorney executed by Trudy.

Trudy was reportedly diagnosed with dementia in 2018. James III appears to have signed a "Residency Agreement" (Residency Agreement) and related documents to facilitate Trudy's admission to Atria in September 2020, individually or as her "Responsible Person," but not as her attorney in fact. Trudy was admitted to Atria's memory care unit. James III signed all the residency documents despite the fact that Marybeth purportedly held a valid

---

[3] It does not appear that James III ever provided Atria with a power of attorney that attached his father's death certificate. Indeed, in its motion to compel arbitration, the Atria defendants seemed to confuse James III with Trudy's husband, arguing that he was authorized to sign the arbitration agreement under both the DPOA and the health care POA.

4

healthcare POA which expressly authorized her to select or discharge health care providers and institutions and which he had provided to Atria. Thereafter, in June 2021, James III executed a separate arbitration agreement with Atria as Trudy's "POA."

The arbitration agreement states that it applies to "any and all claims and disputes related to or arising out of [Trudy's] residence at [Atria] that may be asserted by either party against the other party as well as any claim or dispute" that may be asserted by or against various Atria-related entities. It states that "[a]ny claim or dispute asserted against [the Atria defendants] shall be resolved through submission to individual arbitration as governed by the [FAA], to the maximum extent permitted by law, and/or the Rules of Civil Procedure and Rules of Evidence governing the jurisdiction in which [Atria] is located." Moreover, "[t]he laws of the State in which [Atria] is located shall govern the interpretation and application of [the arbitration agreement] and the Residency Agreement, as well as any and all disputes arising out of or relating to [the arbitration agreement] or the Residency Agreement." The arbitration agreement also contains an express waiver of constitutional jury trial rights.

Page two of the three-page arbitration agreement provides, in regular type at the bottom of the page: "This Agreement is voluntarily entered into by the Parties and is not a pre-requisite to residing at [Atria] or receiving services at [Atria]. Refusal by Resident, Responsible Party, and/or Resident's designee shall not affect residency status. Nothing in this Agreement precludes Resident, Responsible Party, and/or Resident's designee from contacting any regulatory or governing agency in relation to the services provided by [Atria]."

Trudy died on August 29, 2022.

5

*B.*     *The Complaint*

On September 29, 2022, Trudy's children individually, along with James III as successor in interest to Trudy's estate, filed their complaint in this case.  The complaint alleges negligence, wrongful death (§ 337.60), and violations of the Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code, § 15600 et seq.; Elder Abuse Act) and demands a jury trial. Specifically, plaintiffs allege that Trudy was transported to the hospital on August 27, 2022, along with two other residents, after (according to an Atria press release) " 'mistakenly being served dishwashing liquid as juice.' "  First responders were allegedly told that Trudy had located and ingested the liquid on her own, despite the fact that she needed assistance to move around the facility, use the bathroom, feed herself, and change her clothing.  After two days in the hospital, Trudy died from being poisoned with what was apparently an industrial strength cleaning liquid.

Based on these facts, James III asserted a negligence claim and a claim under the Elder Abuse Act against the Atria defendants as the successor in interest to Trudy's estate.  Trudy's children each brought wrongful death actions in their individual capacities against the Atria defendants.  They alleged that their mother would not be dead but for the negligent conduct of the Atria defendants and that her death was foreseeable.

Plaintiffs alleged generally that Atria represents to the public that it has a memory care unit for residents with Alzheimer's disease, dementia, and similar ailments where it offers " '[a]n individual care plan with 24/7 support [ . . . ] from staff with extensive dementia training.' "  According to plaintiffs, Atria had a history of failing to comply with state safety regulations, as well as a specific history of neglecting Trudy despite expressions of concern from her children.  They also alleged that poisoning at senior care facilities was a

6

known industry problem. And that a similar poisoning had taken place at a nearby Atria facility four days before Trudy was poisoned. Plaintiffs sought general, special, and punitive damages against the Atria defendants, as well as costs of suit and attorney fees.

## C.     *The Arbitration Request*

The Atria defendants moved to compel binding arbitration and to stay this matter on October 26, 2022. They claimed that the arbitration agreement was voluntarily signed by James III as attorney in fact and was valid and enforceable. They further argued that "[t]he clear intent" of the agreement was to "bind the parties to contractual arbitration for *all claims* related to [Trudy's] care and services at [Atria]." (Italics added.) Moreover, the Atria defendants argued the enforceability of the arbitration agreement was to be decided by the arbitrator as a threshold matter; the arbitration provision was fair and enforceable; and California procedural rules were preempted by the FAA.

Plaintiffs opposed the Atria defendants' motion and challenged many of their claims. They argued that the individual wrongful death claims of Trudy's children were not arbitrable because they were not parties to the arbitration agreement. They stressed that Marybeth, not James III, had the power to admit Trudy to Atria under the healthcare POA that had been given to Atria prior to Trudy's admission. And they argued that the DPOA provided to Atria was also invalid because it did not attach proof that Trudy's husband had passed away and James III was empowered to act as his successor. Plaintiffs further asserted that the enforceability of the arbitration agreement was a matter for the court; the agreement was unconscionable; any advance waiver of Trudy's jury trial rights was contrary

7

to public policy and void; and the trial court could deny the Atria defendants' request for arbitration under section 1281.2(c).

Plaintiffs supported their opposition with James III's declaration. Among other things, he stated that he had provided Atria with both the DPOA and the health care POA before he admitted his mother to Atria. But he did not attach his father's death certificate to the DPOA. When Atria erroneously contacted him with respect to health care decisions, he repeatedly told them they should be contacting his sister, Marybeth. James III has no legal training. When Atria e-mailed him the draft arbitration agreement in June 2021, some nine months after his mother was admitted, they stated there was " 'still some paperwork [they] were missing for Trudy.' " He signed the arbitration agreement because he thought it was required for Trudy to remain at Atria. No Atria representative ever explained the arbitration agreement to him or told him it was optional. The Atria defendants filed a reply, stressing that James III was authorized to execute the voluntary arbitration agreement, the agreement was valid and enforceable, and arbitrability should be decided by the arbitrator.

In March 2023, the court requested supplemental briefing on a number of issues, including whether the Atria defendants had met their burden to show section 1281.2(c) was preempted by the FAA and whether the facts supported a finding of procedural and substantive unconscionability with respect to the arbitration agreement. Both parties filed supplemental briefing, and the motion was heard on May 25, 2023.

On June 9, 2023, the court filed its order denying the Atria defendants' motion to compel arbitration. Preliminarily, the court concluded it was proper for the court to decide enforceability because the language in the agreement did not clearly and unmistakably delegate the issue to an

8

arbitrator, stating only that an arbitrator "will decide any question about whether a claim or dispute must be arbitrated under this Arbitration Clause to the maximum extent permitted by law." (Compare *Najarro v. Superior Court* (2021) 70 Cal.App.5th 871, 888, 878 [delegation clause clear and unmistakable where it stated: " 'the arbitrator shall have the exclusive power to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of this [a]greement, including the assumption that this [a]greement is unenforceable' "].)[4]

The trial court went on to conclude that James III did not have the authority to execute the arbitration agreement because he did not have the authority to make health care decisions for Trudy, and the arbitration agreement was part of Atria's admissions process. Neither did the arbitration agreement bind Trudy's children with respect to their individual wrongful death claims. The court also determined that the transaction between Atria and Trudy did not involve interstate commerce, and the arbitration agreement allowed for application of either FAA or California procedural rules, including section 1281.2(c). So, there was no preemption.

This timely appeal followed.

## II. DISCUSSION

" 'California has a strong public policy in favor of arbitration and any doubts regarding the arbitrability of a dispute are resolved in favor of arbitration.' " (*Aanderud v. Superior Court* (2017) 13 Cal.App.5th 880, 890 (*Aanderud*).) But "California's policy with respect to the enforceability of arbitration agreements, like federal policy, 'is about treating arbitration contracts like all others, not about fostering arbitration.' " (*Quach v. California Commerce Club, Inc.* (2024) 16 Cal.5th 562, 572, quoting *Morgan*

_____

[4] The Atria defendants do not contest this conclusion.

9

*v. Sundance, Inc.* (2022) 596 U.S. 411, 418.) Both California and federal policy put arbitration agreements "on equal footing" with other types of contracts. (*Quach*, at p. 569; see *Theresa D. v. MBK Senior Living LLC* (2021) 73 Cal.App.5th 18, 24 ["In California, ' "[g]eneral principles of contract law determine whether the parties have entered a binding agreement to arbitrate." ' "].)

"[T]he threshold questions presented by every motion or petition to compel arbitration are whether an agreement to arbitrate exists [citations] and, if so, whether the parties' dispute falls within the scope of that agreement." (*Ahern v. Asset Management Consultants, Inc.* (2022) 74 Cal.App.5th 675, 686–687.) The party seeking arbitration bears the preliminary burden of proving the existence of an applicable agreement to arbitrate. (*San Francisco Police Officers' Assn. v. San Francisco Police Com.* (2018) 27 Cal.App.5th 676, 683.) Once an agreement to arbitrate is established, the party opposing arbitration has the burden to show the arbitration provision does not encompass the claims in the complaint. (*Aanderud, supra,* 13 Cal.App.5th at p. 890.) " 'On appeal, we review orders denying motions to compel arbitration for abuse of discretion unless the matter presents a pure question of law, which we review de novo.' " (*Garcia v. Stoneledge Furniture LLC* (2024) 102 Cal.App.5th 41, 49.)

## A.    *Authority to Execute the Arbitration Agreement*

The crux of this dispute before the trial court was whether execution of the arbitration agreement was a "health care decision." The trial court concluded that it was, based on the Third Appellate District's opinion in *Hutcheson v. Eskaton Fountain Wood Lodge* (2017) 17 Cal.App.5th 937 (*Hutcheson*). However, while this appeal was pending, our high court

reached a different conclusion in *Harrod, supra,* 15 Cal.5th 939. Unfortunately, in this case, *Harrod* raises more questions than it answers.

In *Harrod,* as in this case, the optional arbitration agreement was not signed by the patient. It was signed by a relative. (*Harrod, supra,* 15 Cal.5th at p. 947.) But unlike our case, the signatory in *Harrod* had been granted a formal, written power of attorney to make health care decisions, and she signed documents admitting the patient to a skilled nursing facility under the authority granted in the health care POA. (*Ibid.*) On these facts, the California Supreme Court held the agreement was not within the scope of the signatory's authority, because "agreeing to an optional, separate arbitration agreement with a skilled nursing facility is not a health care decision." (*Id.* at p. 966.)

The *Harrod* court based its reasoning in part on an analysis of the language of the relevant statutes, but also on the need for a rule that conforms to commonsense expectations about the distinction between decisions regarding health care and those generally affecting a person's legal rights. (*Harrod, supra,* 15 Cal.5th at pp. 950, 957–958.) As the court explained, " 'Unlike admission decisions and medical care decisions, the decision whether to agree to an arbitration provision in a nursing home contract is not a necessary decision that must be made to preserve a person's well-being. Rather, an arbitration agreement pertains to the patient's legal rights, and results in a waiver of the right to a jury trial.' " (*Id.* at p. 959.) Thus, "[d]efining health care decisions as including decisions about dispute resolution that are not necessary for health care might create unnecessary tension between the two regimes for powers of attorney and between agents designated under them. Doing so, for example, could undermine the expectations of a principal who designates one agent to make health care

11

decisions and another agent, under the form power of attorney, to make decisions about claims and litigation. A principal executing both form powers of attorney found in [Probate Code] sections 4401 [(power of attorney)] and 4701 [(advance health care directive)] could readily view health care decisions as separate from decisions involving claims and litigation, because the forms expressly make this distinction. In that case, the principal might expect and prefer the agent in charge of claims and litigation to accept or reject optional arbitration agreements. A broad construction of the term health care decision might, therefore, and contrary to the principal's expectations, 'override' a grant of power over claims and litigation decisions." (*Id*. at p. 957.)

The court also considered it relevant that, pursuant to statute, "the health care decision maker for an incapacitated patient is, first, a patient-selected surrogate, second, a patient's 'agent pursuant to an advance health care directive or a power of attorney for health care,' third, a 'conservator or guardian of the patient having the authority to make health care decisions for the patient,' and, fourth, a close family member or friend designated by a health care provider or facility. ([Prob. Code,] § 4712, subds. (a), (b); see also [*id*.], § 4643 [' "Surrogate" means an adult, other than a patient's agent or conservator, authorized under this division to make a health care decision for the patient'].)" (*Harrod*, *supra*, 15 Cal.5th at p. 959.) Thus, "[t]he authority to make health care decisions may devolve upon not only agents carefully selected in advance, but also on surrogates the principal chooses in emergency situations or even those the health care provider chooses itself." (*Ibid*.) In such circumstances, our high court concluded that, "Because the statute gives both agents and as-needed surrogates authority to make health care decisions, that authority, when exercised pursuant to a power of

12

attorney such as [the one in *Harrod*], is not best understood as relating to every possible aspect of a transaction with a skilled nursing facility, such as optional, separate agreements that do not affect health care or the selection of the facility." (*Id.*, at p. 960.)

Resort to the general law of agency in this context would not change the result, because under general agency principals "[t]he nature of the task delegated in a power of attorney itself provides a limit on the powers to be implied." (*Harrod, supra*, 15 Cal.5th at pp. 960–962.) The court also rejected the notion that its decision "emerge[d] from or reflect[ed] hostility towards arbitration." (*Id.* at p. 966.)

Of particular relevance in this case, footnote 7 in the *Harrod* opinion disapproved dicta in *Hutcheson, supra*, 17 Cal.App.5th at pages 956–957, which suggested "a person empowered to make decisions about all a principal's claims and litigation lacks authority to do so when the party across the contracting table is a health care facility or provider." (*Harrod, supra*, 15 Cal.5th at p. 957, fn. 7.) And the court made clear that it was not announcing a rule concerning whether an agent under a DPOA could agree to arbitration when a different person held power over health care decisions— "We have no occasion to address *Hutcheson*'s ultimate concern: whether an agent with power over claims and litigation, but without power over health care decisions, may agree to arbitration with a health care facility with whom the agent had no right to contract for services in the first instance." (*Ibid.*)

At first blush, this case appears to fall squarely within the "footnote 7" scenario *Harrod* explicitly does not resolve. What happens when two separate powers of attorney exist and are held by different people, such as James III's DPOA and Marybeth's health care POA? However, before this issue can be resolved, there are other matters that must be addressed. For

13

example, was the arbitration agreement validly executed when the proffered DPOA had no attached document proving Trudy's husband was deceased? Further, even if authorized to do so, did James III execute the arbitration agreement voluntarily, understanding it was not required as part of the admissions process? And is the dispute over whether Marybeth was authorized to make decisions under the health care POA without evidence in the record that Trudy's primary care physician ever determined that she was unable to make her own health care decisions at all relevant? In light of these open issues, we will remand to the trial court to reconsider the validity of the arbitration agreement in light of *Harrod.*

## B. *Arbitrability of Wrongful Death Claims*

The Atria defendants argue that, if James III lawfully executed the arbitration agreement on Trudy's behalf, broad language in the agreement requires that the wrongful death claims filed by Trudy's eight surviving children should also be subject to arbitration. Trudy's children disagree, stressing that they were never parties to the arbitration agreement. Whether a third party is bound by an arbitration agreement presents a question of law. (*Williams v. Atria Las Posas* (2018) 24 Cal.App.5th 1048, 1053 (*Williams*).) After conducting our independent review of the matter, we agree with the children.

Noting that California law applies to the construction of the arbitration agreement, the Atria defendants contend that the trial court erred by disregarding the clear and explicit language of that agreement when it concluded that it did not bind Trudy's heirs. (*Aanderud, supra*, 13 Cal.App.5th at p. 890 [" 'If contractual language is clear and explicit, it governs.' "]; Civ. Code, § 1638.) They point to the following language: "This Agreement pertains to *any and all claims and disputes related to or arising*

14

*out of* [*Trudy's*] *residence at* [*Atria*] . . . . These claims and disputes pertain to legal claims, civil actions, and/or disputes related to or arising out of [Trudy's] residency at [Atria] or otherwise relating to the care or services provided to [Trudy] at [Atria]." (Italics added.) Since the children's wrongful death claims are premised on Trudy's inadequate care at Atria, the Atria defendants posit, such claims are covered by the arbitration agreement. Not so.

The arbitration agreement makes clear that it applies only to disputes between *the parties*, here, Trudy and Atria (along with certain Atria-related entities). Indeed, the language the Atria defendants cite actually states in context, "This Agreement pertains to any and all claims and disputes related to or arising out of [Trudy's] residence at [Atria] *that may be asserted by either party against the other party* as well as any claim or dispute that may be asserted by or against [various Atria-related entities]." (Italics added.) Other portions of the arbitration agreement support our interpretation. For example, under "Purpose & Consideration," the agreement states that "[a]rbitration provides an alternative means for *the Parties* to resolve any claim or dispute" and that "*the Parties* voluntarily and mutually agree and assent to enter into this Agreement." (Italics added.)

The children's wrongful death claims are not derivative of Trudy's causes of action, which are within the purview of the plain language in the arbitration agreement. In California, a wrongful death claim is personal and lies independent of survivor claims. " 'Unlike some jurisdictions wherein wrongful death actions are derivative, Code of Civil Procedure section 377.60 "creates a *new cause of action* in favor of the heirs as beneficiaries, based upon their own independent pecuniary injury suffered by loss of a relative, and distinct from any the deceased might have maintained had he

15

survived." ' " (*Daniels v. Sunrise Senior Living, Inc.* (2013) 212 Cal.App.4th 674, 680 (*Daniels*), italics added by *Daniels*.) Thus, "the measure of damages [in a wrongful death action] is the value of the benefits *the heirs* could reasonably expect to have received from the deceased if she had lived [citations]. These benefits include the personal services, advice, and training the heirs would have received from the deceased, and the value of her society and companionship." (*Allen v. Toledo* (1980) 109 Cal.App.3d 415, 423, italics added.)

Moreover, as the children correctly maintain, generally " '[p]arties can only be compelled to arbitrate when they have agreed to do so.' " (*Williams*, *supra*, 24 Cal.App.5th at p. 1053; accord, *Espejo v. Southern California Permanente Medical Group* (2016) 246 Cal.App.4th 1047, 1057 [although public policy favors arbitration, that policy " ' " 'does not extend to those who are not parties to an arbitration agreement' " ' "].) Here, there is no evidence that any of Trudy's children other than James III signed the arbitration agreement or otherwise agreed to its terms. And James III signed only in his representative capacity as Trudy's successor in interest under the DPOA.

In *Fitzhugh v. Granada Healthcare & Rehabilitation Center, LLC* (2007) 150 Cal.App.4th 469, our colleagues in Division Three of this District concluded that wrongful death claims were not subject to arbitration under like circumstances. There, George Fitzhugh (individually and as the successor in interest to his deceased wife) and the decedent's two adult sons (John and Frank) filed a complaint against a convalescent center and certain related entities alleging, among other things, causes of action for elder abuse and wrongful death. (*Id.* at p. 471.) George had previously executed an arbitration agreement as his wife's " 'Legal Representative/Agent.' " (*Id.* at p. 472.) Even though the arbitration agreement in *Fitzhugh*, unlike the

16

agreement in this case, purported to bind " 'the heirs, representatives, executors, administrators, successors, and assigns' " of the decedent, the court concluded: "Because there is no evidence that George Fitzhugh signed the arbitration agreement[] in his personal capacity, and because John and Frank Fitzhugh did not sign the arbitration agreement[], there is no basis to infer that they waived their personal right to jury trial on the wrongful death claim." (*Id*. at pp. 472, 474.)

We similarly conclude that, because James III is not acting in a representative capacity with respect to his wrongful death allegations but is instead pursuing his own claim based on Atria's alleged misconduct, he and his siblings are not bound by an arbitration agreement which they did not sign. The trial court thus correctly determined that the wrongful death claims in this case are not arbitrable.

## C.    *Applicability of Section 1281.2(c)*

In light of our holding that the wrongful death claims are not arbitrable, we will consider whether section 1281.2(c) applies to these proceedings. The Atria defendants argue that this state procedural statute is preempted by the FAA. The trial court disagreed, finding both that the transaction between Trudy and Atria did not involve interstate commerce and that the language of the arbitration agreement allowed for the application of California procedural rules, including section 1281.2(c). Because we agree with the trial court's interpretation of the contractual language, we will not reach the interstate commerce question.

### 1.    **Section 1281.2(c)**

Generally speaking, a trial court will order parties to arbitrate a dispute "if it determines that an agreement to arbitrate the controversy exists." (§ 1281.2, 1st par.) However, section 1281.2(c), allows a court to stay

or refuse to compel arbitration of all or part of an arbitrable controversy when (1) "[a] party to the arbitration agreement is also a party to a pending court action . . . with a third party, arising out of the same transaction or series of related transactions," and (2) "there is a possibility of conflicting rulings on a common issue of law or fact." As used in the statute, a "third party" is one who is neither bound by nor entitled to enforce the arbitration agreement. (*Thomas v. Westlake* (2012) 204 Cal.App.4th 605, 612.) Thus, section 1281.2(c) " 'addresses the peculiar situation that arises when a controversy also affects claims by or against other parties not bound by the arbitration agreement.' " (*Cronus Investments, Inc. v. Concierge Services* (2005) 35 Cal.4th 376, 393 (*Cronus*).)

If the conditions set forth in section 1281.2 are satisfied, the statute "identifies four options from which the court may choose": "(1) . . . refuse to enforce the arbitration agreement and . . . order intervention or joinder of all parties in a single action or special proceeding; (2) . . . order intervention or joinder as to all or only certain issues; (3) . . . order arbitration among the parties who have agreed to arbitration and stay the pending court action or special proceeding pending the outcome of the arbitration proceeding; or (4) . . . stay arbitration pending the outcome of the court action or special proceeding.' " (*Williams, supra*, 24 Cal.App.5th at p. 1054; § 1281.2, subd. (d), 4th par.)

Whether an arbitration agreement is binding on a third party (e.g., a nonsignatory) is a question of law subject to de novo review. (*Suh v. Superior Court* (2010) 181 Cal.App.4th 1504, 1512.) "By contrast, the ultimate determination whether to stay or deny arbitration based on the possibility of conflicting rulings on common questions of law or fact is reviewed for an abuse of discretion. [Citation.] 'The court's discretion under section 1281.2,

18

subdivision (c) does not come into play until it is ascertained that the subdivision applies, which requires the threshold determination of whether there are nonarbitrable claims against at least one of the parties to the litigation.' " (*Daniels*, *supra*, 212 Cal.App.4th at p. 680.)

Since we have concluded that the children's wrongful death claims are not subject to the arbitration agreement, they  are clearly third parties for purposes of section 1281.2(c).  Further, the arbitration agreement signed by James III (as Trudy's successor) said it covered any dispute between Trudy and Atria arising out of Trudy's residence at Atria.  The elder abuse and negligence causes of action are arbitrable disputes if the arbitration agreement was valid and enforceable.  Moreover, they arose out of the same facts as the wrongful death causes of action.  As described above, although the measure of damages differs, all of the claims in the complaint rely on allegations that Atria failed to appropriately train their staff and follow safety regulations, which led to Trudy's death.  Under these circumstances, the trial court had discretion under section 1281.2(c) to deny the Atria defendants' motion to compel arbitration or stay that arbitration with respect to Trudy's claims to avoid conflicting rulings.  (Compare *Avila v. Southern California Specialty Care, Inc.* (2018) 20 Cal.App.5th 835, 837–839, 845  [no abuse of discretion in denying motion to compel arbitration under § 1281.2(c) where there was a strong possibility of inconsistent rulings if survivor claims (negligence and elder abuse) were arbitrated and a wrongful death claim was litigated]; *Daniels*, *supra,* 212 Cal.App.4th at pp. 677–678, 686–687.)

A  different result would be reached, however, if the FAA preempts this state procedural statute.  The Atria defendants argue section 1281.2(c) is preempted.  We conclude that it is not.

## 2.     No FAA Preemption

"The FAA 'requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms.'  [Citation.] 'Arbitration under the [FAA] is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit.  Just as they may limit by contract the issues which they will arbitrate, [citation], so too may they specify by contract the rules under which that arbitration will be conducted.'  [Citation.]  Under these principles, the parties 'might choose to have portions of their contract governed by the law of Tibet, the law of pre-revolutionary Russia, or (as is relevant here) the law of California' irrespective of that law's preemption by the FAA."  (*Saheli v. White Memorial Medical Center* (2018) 21 Cal.App.5th 308, 316, fn. omitted; accord, *Best Interiors, Inc. v. Millie & Severson, Inc.* (2008) 161 Cal.App.4th 1320, 1326 (*Best Interiors*) ["even if the FAA applies . . . the parties may agree that California law governs their agreement to arbitrate"].)

Here, the arbitration agreement states in relevant part:  "Any claim or dispute asserted against Atria shall be resolved through submission to individual arbitration as governed by the [FAA], to the maximum extent permitted by law, and/or the Rules of Civil Procedure and Rules of Evidence governing the jurisdiction in which [Atria] is located"—i.e., California.  The arbitration agreement further provides that California law "shall govern the interpretation and application of this Agreement and the Residency Agreement, as well as any and all disputes arising out of or relating to this Agreement or the Residency Agreement."

The question before us is whether this contractual language precludes the trial court from applying section 1281.2(c) in this context.  In making such a determination, "we examine the language of the contract to determine

20

whether the parties intended to apply the FAA to the exclusion of California procedural law and, if any ambiguity exists, to determine whether section 1281.2(c) conflicts with or frustrates the objectives of the FAA." (*Cronus, supra,* 35 Cal.4th at p. 383.)

The language of the arbitration agreement leaves room here for the application of California procedural and evidentiary rules, including section 1281.2(c).  It states that arbitration will be governed by the FAA "and/or" the California "Rules of  Civil Procedure and Rules of Evidence." Generally, the procedural aspects of the FAA do not apply in state court absent an express provision in the arbitration agreement.  (See *Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 922 [even where agreement specifies the FAA governs any disputes, California law governs procedures]; *Cronus*, *supra*, 35 Cal.4th at pp. 388–390.)  Here, although the arbitration agreement states that the FAA will apply "to the maximum extent," we do not interpret "maximum extent" to mean complete preemption of all procedural rules.

Rather, the Supreme Court's decision in *Cronus* is instructive.  There, the arbitration agreement stated it was governed by California law but continued: " 'The designation of a situs or specifically a governing law for this agreement or the arbitration shall not be deemed an election to preclude application of the [FAA], if it would be applicable.' " (*Cronus*, *supra*, 35 Cal.4th at p. 387.)  The parties agreed that this language meant that the scope of the California choice-of-law provision was " 'specifically limited by applicable provisions of the FAA' " and was nullified " 'only where the FAA's provisions were inconsistent.' " (*Ibid.*)  "Unlike its California counterpart, the FAA 'contains no provision permitting a court to stay arbitration pending resolution of related litigation involving third parties not bound by the

21

arbitration agreement.' " (*Best Interiors, supra*, 161 Cal.App.4th at p. 1325.) Thus, there was no inconsistency, and section 1281.2 was not preempted by the FAA under the language of the arbitration contract. (*Cronus,* at p. 394.)

The *Cronus* court recognized that, while "state law may be applied to regulate contracts, including arbitration clauses, ' "*if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally[,]" [citation]' courts may not invalidate arbitration agreements under state law contract principles applicable *only* to arbitration provisions, and that therefore disfavor such contracts, or single them out for 'suspect status.' " (*Cronus, supra*, 35 Cal.4th at p. 385, quoting *Doctor's Associates, Inc. v. Casarotto* (1996) 517 U.S. 681, 686–687.) But it went on to clarify that "section 1281.2(c) is *not* a special rule limiting the authority of arbitrators. It is an evenhanded law that allows the trial court to stay arbitration proceedings while the concurrent lawsuit proceeds *or* stay the lawsuit while arbitration proceeds to avoid conflicting rulings on common issues of fact and law amongst interrelated parties. Moreover, '[s]ection 1281.2(c) is not a provision designed to limit the rights of parties who choose to arbitrate or otherwise to discourage the use of arbitration.' Rather, it is part of California's statutory scheme 'designed to enforce the parties' arbitration agreements, as the FAA requires.' " (*Cronus, supra*, 35 Cal.4th at p. 393; accord, *Doctor's Associates, supra*, 517 U.S. at p. 688 [describing § 1281.2(c) as "determin[ing] only the efficient order of proceedings [and] not affect[ing] the enforceability of the arbitration agreement itself"].)

In sum, the *Cronus* court concluded "that the language of the arbitration clause in [that] case, calling for the application of the FAA 'if it would be applicable,' should not be read to preclude the application of [section] 1281.2(c), because it does not conflict with the applicable provisions

of the FAA and does not undermine or frustrate the FAA's substantive policy favoring arbitration." (*Cronus, supra*, 35 Cal.4th at p. 394.) So too, here. The arbitration agreement does not operate to preempt section 1281.2(c), because our state statute is an *additional* procedural rule that neither conflicts with application of the FAA to its "maximum extent" nor California procedural rules as mandated by the contractual language. Nor does section 1281.2(c) frustrate FAA policy favoring arbitration.

## D.    *Instructions on Remand*

Under the circumstances, we remand this case to the trial court with directions to reconsider disposition of the motion to compel arbitration in light of *Harrod, supra*, 15 Cal.5th 939 and section 1281.2(c). The trial court must first consider whether the DPOA as presented to Atria by James III was valid. If so, the trial court must next determine whether the arbitration agreement is otherwise enforceable given the facts surrounding its execution. If the trial court determines the DPOA as presented to Atria was valid and the arbitration agreement is otherwise enforceable under the facts surrounding its execution, then the trial court must determine whether Marybeth, rather than James III, held the authority to admit Trudy to Atria under the health care POA, and, if she did, whether James III nevertheless had the authority to agree to arbitration. In other words, if there existed both a health care POA and a DPOA, held by different persons, does this affect application of the holding in *Harrod*.[5]

---

[5] It is also possible the court may determine that the appropriate resolution of this case is to deny arbitration altogether under section 1281.2(c). If so, it could assume without deciding that the arbitration agreement was validly executed by James III without determining whether it is enforceable under *Harrod*.

23

## III.  DISPOSITION

The judgment is reversed and the matter is remanded for further proceedings consistent with this opinion.  Each party shall bear their own costs on appeal.


SIGGINS, J.*


WE CONCUR:


BANKE, ACTING P. J.


LANGHORNE WILSON, J.

---

* Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:         Superior Court of San Mateo County

Trial Judge:         Susan L. Greenberg, Judge

Counsel:

Lewis Brisbois Bisgaard & Smith LLP, Lann G. McIntyre, Tracy D. Forbath and Reuben B. Jacobson for Defendants and Appellants.

Cotchett, Pitre & McCarthy, LLP, Niall P. McCarthy, Anne Marie Murphy, Tamarah P. Prevost and David G. Hollenberg  for Plaintiffs and Respondents.